CHEMICAL SEPARATION
TECHNOLOGY, INC.,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 97–21C.

United States Court of Federal Claims.

March 11, 2002.

Louis M. Tarasi, Jr. and C. William Kenny, Pittsburgh, Pennsylvania, for plaintiffs.

Cameron Elliot, U.S. Department of Justice, with whom was Assistant Attorney General David W. Ogden and Vito J. DiPietro, Director, Civil Division, for defendant.

## OPINION

ALLEGRA, Judge.

Chemical Separation Technology, Inc. (CST) and Sanford M. Stevenson seek compensation from the government, under 28 U.S.C. § 1498(a), for unlawful use of two of their patents. The patents at issue are U.S. Patent No. 5,370,800 (the 800 patent) and U.S. Patent No. 4,749,497 (the 497 patent), both of which relate to the treatment of waste water and are used in a device marketed by CST. In this opinion, the second in this case, the court supplies the rationale for its prior ruling construing the patents and addresses defendant's various assertions that the patents are invalid.

## I. BACKGROUND

CST, an Idaho corporation, and its president and major shareholder, Sanford M. Stevenson, are owners of two U.S. patents that relate to the treatment of waste water. The '497 patent was applied for on August 7, 1987, as a continuation of abandoned application Ser. No. 820,955, originally filed on January 21, 1986. It was granted on June 7, 1988, and issued to CST by virtue of an assignment from the named inventors (Richard S. Kanzleiter, Thomas G. Simonetti, Kenneth E. Ball, and plaintiff Sanford M. Stevenson) recorded in the U.S. Patent and Trademark Office (PTO) on November 2, 1987. The patent "relates to a method and apparatus for treatment of acidic water and more specifically relates to water treatment

of mine drainage." The '497 patent is the preferred embodiment of the primary reaction tank used in the method of the second patent at issue, the '800 patent. The '800 patent was applied for on May 25, 1993, and granted on December 6, 1994. The patented "method" is used in an apparatus constructed by CST known as a "portable interim treatment system" (PIT System or PITS). The PIT System, using a series of chemical agents, precipitates and removes hazardous minerals and compounds from acidic mine waste water. A critical feature of the "method," according to the plaintiffs, is the addition of cationic and anionic polymers[1] to the polluted water, thereby causing the precipitated minerals to clump together (flocculate).

On April 14, 1992, CST made a formal offer of sale of a waste water treatment system utilizing the PIT System to Summitville Consolidated Mining Company (Summitville), a subsidiary of Galactic Resources, Inc. (Galactic). This offer was accepted by Summitville on April 24, 1992, and a purchase order was signed by an agent of Summitville on May 5, 1992. A PIT System was installed at the Summitville site on July 15, 1992. For a short time Galactic utilized the PIT System at the licensed rate, but soon abandoned the site.

The PIT System was left in place at Summitville after Galactic abandoned the site. In December, 1992, defendant, through the U.S. Environmental Protection Agency (EPA), began an emergency Superfund response action at the Summitville site. An outside firm, the Environmental Chemical Company (ECC) was retained to serve as the emergency response contractor to manage the clean-up of the site. The clean-up included treatment of waste water, which ECC accomplished using the PITS already installed at the site. In 1993, ECC issued a request for proposals seeking contract bids for enhancing the ca-

pacity of the PIT System. CST submitted a proposal, but ECC chose not to award the contract and performed the work on the PIT System itself.

On January 13, 1997, plaintiffs brought suit claiming that: (i) ECC performed this enhancement, a modification that resulted in an operation of the PIT System at an unlicensed rate; (ii) defendant allowed ECC to perform this work without a license; and (iii) defendant has continued to use plaintiffs' patents without license since 1993. Plaintiffs' complaint seeks compensation for the allegedly unlawful use of their patents pursuant to 28 U.S.C. § 1498 and the takings clause of the Fifth Amendment. On April 28, 1999, defendant responded to the claim of infringement by filing a motion for partial summary judgment, asking this court to declare the '800 patent invalid due to plaintiffs' violation of the on-sale doctrine enunciated in 35 U.S.C. § 102(b). By order dated December 14, 1999, this court found that material questions of fact remained regarding whether the "invention later claimed" was on sale before the critical date. Subsequently, the parties raised issues concerning the construction of the patents in question and defendant raised additional assertions regarding the validity of the '497 and '800 patents. The court conducted a *Markman* hearing in this case on November 7, 2000, and November 13–14, 2000. On November 14, 2000, the court orally ruled on the issues involving the construction of the patents, reserving for this order an explanation of the reasoning for its various constructs. On November 15–17, 2000, the court conducted trial concerning the factual issues raised in defendant's various assertions that the patents in question were invalid. Following post-trial briefs, closing arguments in this case were heard on June 29, 2001.

Currently, there are two overarching issues before the court: The first, stemming

---

1. A polymer is a macromolecule, a string of organic or inorganic molecules, formed by the chemical union of at least five identical monomers, which are simple molecules or compounds usually made of carbon and exhibiting simple structure and low molecular weight. *See Hawley's Condensed Chemical Dictionary* 900 (13th ed.1997). A cationic polymer exhibits a positive ionic charge, while an anionic polymer exhibits a negative ionic charge. *Id.* at 77, 223–24. Polymers aid in flocculation by forcing suspended metal particles to aggregate into clumps or tufts as they pass through a solution containing these long chains of inorganic or organic compounds. *Id.* at 506.

from this court's oral ruling of November 14, 2000, involves explaining the rationale for this court's construction of the patents in question. The second involves the various assertions defendant has made concerning the validity of the patents. The court will consider these broad issues *seriatim*.

## II. CLAIM CONSTRUCTION

■ Determination of claim construction, including the terms of art found therein, is a matter of law for the court to decide. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The Federal Circuit has instructed that, "when construing a claim, a court should look first to the intrinsic evidence, *i.e.,* the claims themselves, the written description portion of the specification, and the prosecution history." *Bell & Howell Document Management v. Altek Sys.,* 132 F.3d 701, 705 (Fed.Cir.1997).

■ "The starting point for any claim construction must be the claims themselves." *Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1305 (Fed.Cir.1999). Generally, a claim is given its ordinary and customary meaning; that is, the meaning given to it by those skilled in the art. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996); *Estate of Wicker v. United States,* 43 Fed.Cl. 172, 176 (Fed.Cl.1999). However, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Northern Telecom, Ltd. v. Samsung Electronics Co., Ltd.,* 215 F.3d 1281, 1293 (Fed. Cir.2000) (quoting *Vitronics Corp.,* 90 F.3d at 1582); *see also Zoltek Corp. v. United States,* 48 Fed.Cl. 290, 292 (Fed.Cl.2000).[2] Further, "[t]he prosecution history is often helpful in understanding the intended meaning as well as the scope of technical terms, and to establish whether any aspect thereof was restricted for purposes of patentability." *Vivid Technologies, Inc. v. American Science & Engineering, Inc.,* 200 F.3d 795, 804 (Fed.

Cir.1999); *see also Masco Corp. v. United States,* 47 Fed.Cl. 449, 452 (Fed.Cl.2000). Summarizing, the Federal Circuit, in its own watershed decision in *Markman,* stated: "To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history." *Markman v. Westview Instruments, Inc.,* 52 F.3d at 979; *see also Bell & Howell Document Management v. Altek Systems,* 132 F.3d at 706.

■ After considering this intrinsic evidence, the court may also "consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes,* 182 F.3d at 1309. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman,* 52 F.3d at 980; *see also Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1552 (Fed.Cir.1997). However, "[e]xtrinsic evidence may not be relied upon during claim construction when the intrinsic evidence unambiguously defines the disputed claim language." *Personalized Media v. Int'l Trade Comm'n,* 161 F.3d 696, 706 (Fed.Cir.1998). Further describing the limited role such evidence plays, the Federal Circuit has indicated that "[e]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Markman,* 52 F.3d at 981 (citing *U.S. Indus. Chems., Inc. v. Carbide & Carbon Chems. Corp.,* 315 U.S. 668, 678, 62 S.Ct. 839, 86 L.Ed. 1105 (1942)); *see also Fike Corp. v. United States,* 41 Fed.Cl. 776, 782 (1998).

As noted above, on November 14, 2000, at the conclusion of the *Markman* hearing in the instant case, and before initiation of the trial on the validity issues presented herein, the court orally ruled on all but one of the claim construction issues presented by the parties. While defendant initially raised dozens of issues concerning the construction of

---

**2.** According to the Patent Act, the specification includes not only the claims of the patent, but also the enablement, written invention descrip-

tion, and best mode. *See* 35 U.S.C. § 112 (1994); *see also Markman,* 52 F.3d at 979.

the patents, disputes as to five claims eventually predominated: two regarding the '497 patent and three regarding the '800 patent. The court will discuss the rationale for its prior rulings on these claims first before turning to the construction of the other claims which remain disputed.

## A. The '497 patent

Claim 1 of the '497 patent reads:

1. A water treatment apparatus comprising,

a reaction vessel,

a source of acidic or metal-bearing water,

**influent pipe means** operatively connected to said reaction vessel for delivering said water to be treated from said water source to said reaction vessel,

aerator means having a shaft extending therefrom into said reaction vessel said shaft having a discharge end for discharging oxidant,

said aerator means having an agitation means,

said influent pipe means disposed generally adjacent to the discharge end of said aerator shaft,

a neutralizing agent feed line means leading from neutralizing supply means into said reaction vessel for delivering neutralizing agent,

said neutralization feed line means operatively associated with said aerator shaft such that a discharge end of said neutralizing agent feed line is positioned generally adjacent to said agitation means,

pump means operatively associated with said reaction vessel,

power source means operatively associated with said reaction vessel for energizing said apparatus,

effluent discharge pipe means operatively connected to said reaction vessel for discharging the water, and

automated metering and control means for delivering said neutralizing agent into said reaction vessel through said neutralizing agent feed line means and oxidant from said aerator means at substantially the same time, **whereby said oxidant impinging upon the water entering said reac-**

**tion vessel will aerate said water and establish mixing therein so as to enhance efficiency of distribution of said neutralizing agent in said water to reduce reaction time and enhance efficiency of said reaction.**

The parties disagreed as to the construction of two critical aspects of claim 1 of the '497 patent (the two highlighted above). The resolution of those disagreements is as follows:

### 1. Claim 1: "influent pipe means."

Based solely on its review of the intrinsic evidence, the court concluded that the associated structure for this means-plus-function were influent conduit 9 and conduit 18 in Figure 3 of the patent. While defendant agreed that this element is a means-plus-function, it asserted that the associated structures for this function included not only items 9 and 18 of the patent, but also conduits 21 and 22.

Section 112, paragraph 6 of the Patent Act permits the use of mean-plus-function language:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112 ¶ 6 (1994). Under this section, the device must perform the identical function as specified in the claims of the patent in suit. *King Instruments Corp. v. Perego,* 65 F.3d 941, 945–46 (Fed.Cir.1995), *cert. denied,* 517 U.S. 1188, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996). Regarding such means-plus-functions, the Federal Circuit has held that, in the absence of other claim language that restricts the scope of the claim, the means or steps described exclusively in functional terms are to be construed to cover the corresponding structures described in the specification for performing that function and equivalents thereof. *In re Donaldson Co.,* 16 F.3d 1189, 1193 (Fed.Cir.1994) (en banc); *see also Pfund v. United States,* 40 Fed.Cl. 313, 326 (1998).

Under claim 1, the "influent pipe means" is designed to "deliver [the metal-bearing] water to be treated from said water source to said reaction vessel." A review of the accompanying Figure 3, reveals that the only two items which perform this function are influent conduit 9 and conduit 18. According to the description of the preferred embodiment, conduit 21 contains aerator shaft 15 and extends down from the aerator motor 6. Contrary to defendant's claim, this item thus is not involved in delivering the water to be treated from the water source to the reaction vessel. The same can be said of conduit 22, which, under the description of the preferred embodiment, does not bring the waste water into the reaction tank, but rather sends a mixture of the waste water, the oxidant and the caustic agent to another area of the reaction vessel, one that may contain internal baffles. Accordingly, the court agrees with plaintiffs that the "influent pipe means" corresponds only to items 9 and 18 in Figure 3 of the patent.

Patent 497 Figure 3

2. **Claim 1: "whereby said oxidant impinging upon the water entering said reaction vessel will aerate said water and establish mixing therein so as to enhance efficiency of distribution of said neutralizing agent in said water to reduce reaction time and enhance efficiency of said reaction."**

In its oral ruling, the court held that this element was definite and that the "reaction" referred to is the introduction of waste water, neutralizer, oxidant and agitation. Defendant argued that this element is indefinite, asserting that the last two elements thereof, beginning with the phrase "enhance efficiency of . . .," are particularly "opaque." It asserted that no "said reaction" is defined in the claim and that it is unclear how the claimed invention "enhances" the "efficiency of distribution of said neutralizing agent."

Regarding whether a patent is sufficiently definite, section 112, paragraph 2 of the Patent Act prescribes: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2 (1994). Whether a claim is indefinite under this paragraph is a question of law. *Personalized Media Communications, LLC v. Int'l Trade Comm.*, 161 F.3d at 702–03 (citing *North Am. Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed.Cir.1993)). "The test for definiteness is whether one skilled in the art would understand the bounds of the claim when read in light of the specification. If the claims read in light of

the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 875 (Fed. Cir.1993) (internal citations omitted), *cert. denied*, 510 U.S. 1100, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994). Burnishing this explanation, the Federal Circuit, in *Exxon Research and Engineering Co. v. United States*, 265 F.3d 1371 (Fed.Cir.2001), recently stated:

> In determining whether that standard is met, .., we have not held that a claim is indefinite merely because it poses a difficult issue of claim construction.... Under a broad concept of indefiniteness, all but the clearest claim construction issues could be regarded as giving rise to invalidating indefiniteness in the claims at issue. But we have not adopted that approach to the law of indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be. If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite. If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.

*Exxon*, 265 F.3d at 1375 (citation omitted). The court further noted that "[b]y finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity, .., and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." *Id.* (citations omitted); *see also Athletic Alternatives, Inc. v. Prince Mfgr., Inc.*, 73 F.3d 1573, 1581 (Fed.Cir.1996).

■ Applying these root principles, the court finds that one skilled in the art would understand that the "reaction" referred to in this element is the introduction of waste water, neutralizer, oxidant and agitation. Several pieces of intrinsic evidence support this construction. First, the element under consideration itself describes the reaction as involving the "oxidant impinging upon the water entering said reaction vessel," thereby "establish[ing] mixing therein so as to enhance efficiency of distribution of said neutralizing agent in said water." Further evidence that this, indeed, is the "reaction" referred to in the claim may be found in the summary of the invention, which states that an "object of the invention is to maximize treatment of the water by introducing the neutralizing agent and the oxidant at the same point in the water system simultaneously." Moreover, the description of the preferred embodiment indicates:

> The apparatus is connected to a source of the raw water, such as a stream.... A caustic substance is injected into the system which neutralizes the acid in the water. At generally the same point, an aerator introduces oxidant into the influent flow stream. The neutralization means and aerator means are in generally close proximity and oriented in generally the same axial position. The flow stream experiences substantially instantaneous elevation of pH and the oxidation rate required for treatment is thereby greatly accelerated.

Finally, emphasizing that the reaction associated with this claim involves both the introduction of the neutralizer and the oxidant, as well as agitation, the specification indicates that where the treatment contains internal baffles, such baffles "allow for mixing, turbulence increasing and extended contact time," and are designed to "insure that the treatment reactions are complete prior to discharge from the reaction vessel." Accordingly, while defendant argues that it is unclear whether the reaction described involves *either* neutralization or oxidation, the intrinsic evidence associated with the patent leaves no doubt that *both* subprocesses are involved.

■ Because, in the court's view, one skilled in the art would understand what was meant by the claim's reference to "said reaction," the court also readily deduces that the patent is not indefinite to the extent it claims a process to "enhance [the] efficiency of distribution of said neutralizing agent." To a certain extent, the meaning of this phrase is bound up with the meaning of the last phrase

in this same element, which indicates that the process is designed to "enhance [the] efficiency of said reaction." Regarding this latter point, the patent describes how it more efficiently treats the waste water, articulating in the specification that:

> The simultaneous introduction of the air, water and the chemical in a regulated manner accelerates the reaction time. Because of this instantaneous reaction time, large bulk mixing and reaction chambers are not needed.

To like effect is the summary of the invention, which discloses that "[i]t is a further object of the invention to maximize treatment of the water by introducing the neutralizing agent and the oxidant at the same point into the water system simultaneously." Consistent with this intrinsic evidence, it appears that the apparatus enhances the efficiency of the distribution of the neutralizing agent through aerating and agitating the waste stream at the same time that the neutralizer is being introduced.

■ Ultimately, defendant relies upon extrinsic evidence—the testimony of its expert—to support its assertion that this element of the claim is indefinite. However, as noted above, it is axiomatic that extrinsic evidence may not be relied upon where intrinsic evidence unambiguously defines disputed claim language. See Kopykake Enterprises, Inc. v. The Lucks Co., 264 F.3d 1377, 1381 (Fed.Cir.2001); Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1216 (Fed. Cir.1995), cert. denied, 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997). As a corollary to this rule, the Federal Circuit has repeatedly proclaimed that extrinsic evidence may not be employed to create ambiguity not found in the patent. See, e.g., Interactive Gift Exp., Inc. v. Compuserve, Inc., 256 F.3d 1323, 1334 (Fed.Cir.2001) ("[g]iven the lack of ambiguity in the intrinsic evidence, it would be improper to address any of the parties' arguments relating to extrinsic evidence"); Vitronics, 90 F.3d at 1583 ("In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper."). Honoring these tenets, this court rejects defendant's attempt to inject ambiguity into the patent's language through the use of extrinsic evidence. The disputed language is not indefinite.

## B. The '800 Patent

Claim 1 of the '800 patent reads:

A method of **removing** metal compounds selected from iron, manganese, aluminum, zinc, copper, lead, arsenic and chromium from waste water comprising the steps of:

(a) **adjusting the pH of the waste water to from about 5 to about 12;**

(b) aerating the waste water;

(c) agitating the waste water, where steps (a), (b) and (c) are carried out simultaneously in a reaction tank and waste water is **aerated in said reaction tank to provide a dissolved oxygen concentration at from about 0.01 lb./hr. to about 70 lbs./ hr.** at a waste water input flow rate of from about 50 gal./min. to about 500 gal. /min. for a metals concentration of from about 50 mg./l. to about 1,000 mg./l.;

(d) then adding a flocculating agent polymer selected from a group consisting of cationic and anionic polymers to the water and allowing floccules including said metal compounds to form; and

(e) then separating said floccules including said metal compounds from the water.

The parties disagreed as to the construction of three critical aspects of Claim 1 of the '800 patent (the three highlighted phrases above). The resolution of those disagreements is as follows:

### 1. Claim 1: "Removing."

■ In its oral ruling, this court construed the phrase "removing" to mean "to take away or eliminate." Defendant noted that the claim recites no particular removal percentage or standard. It argued that, in such circumstances, it is neither reasonable to construe the claim as indicating that the listed metals will be entirely removed nor to construe it as indicating that only a trivial amount of these metals would be removed. Based on references to EPA limits in the patent's specifications, defendant concluded, therefore, that the term "removing" must

mean "removing to below the appropriate EPA permitted limit."

Words in a patent are given their ordinary meaning unless it is clear that the patentee intended to use them differently. *National Recovery Technologies v. Magnetic Separation Systems,* 166 F.3d 1190, 1195 (Fed.Cir. 1999); *see also Gentex Corp. v. Donnelly Corp.,* 69 F.3d 527, 530 (Fed.Cir.1995) ("Words in claims are to be given their ordinary meaning in the absence of indication in the patent to the contrary."). In the court's view, "removing" is used in the patent in its ordinary sense—two accepted dictionary definitions for the word "remove" are "to take away; withdraw" and "to do away with; eliminate." *See The American Heritage Dictionary of the English Language* 1476 (4th ed.2000).[3] While, in limited circumstances, a patentee may "be his own lexicographer," *Vitronics,* 90 F.3d at 1582, no special definition of the term "removing" is apparent in any of the intrinsic evidence relating to the patent. *See Vivid Technologies, Inc.,* 200 F.3d at 805.

In an effort to force-feed its limiting definition of "removing," defendant focuses on language in an example following the specifications which states that "[w]ater leaving the polishing pond consistently had a metal ion concentration below EPA permitted limits." That this example involved a situation in which the effluent "consistently" had concentrations below EPA limits does not mean, however, that the patented method was to ensure that all effluents would always meet such limits. To the contrary, the Federal Circuit has underscored that, "[w]hile ... claims are to be interpreted in light of the specification and with a view toward ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland,* 847 F.2d 1573, 1581 (Fed.Cir.1988). Indeed, in an earlier case, that court similarly cautioned against "limiting the claimed invention to the preferred embodiments or specific examples in the specification." *Texas Instru-*

*ments, Inc. v. U.S. Int'l Trade Comm'n,* 805 F.2d 1558, 1563 (Fed.Cir.1986); *see also Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 93 F.3d 1572, 1578 (Fed.Cir. 1996); *Prochroma v. United States,* 46 Fed. Cl. 750, 755 (Fed.Cl.2000). Based on this precedent, and defendant's failure to produce clear and convincing evidence to the contrary, the court refuses to read a limitation into the claim based upon an isolated example in the specification.

#### 2. Claim 1: "Adjusting the pH of the water to from about 5 to about 12."

In its oral ruling, the court held that this portion of claim 1 is not indefinite and that it refers to "bringing to a pH point within the range specified that optimizes the precipitation of metals, said point to be determined by reasonable experimentation." Defendant had advanced that the use of the term "about" rendered this claim indefinite because it fails adequately to apprise the public of the upper and lower limits of the range—limits that allegedly are discernible neither from the specification, prosecution history, nor prior art. Defendant charged that the patent does not give an indication how far below a pH of 5 or above a pH of 12 a user may go without infringing. In response, plaintiffs argued that the range specified is as precise as the art allows.

Defendant relies heavily on snippets plucked from *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.,* 927 F.2d 1200 (Fed.Cir. 1991), *cert. denied,* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991), a case that involved a patent for DNA sequences. There, the Federal Circuit affirmed the district court's ruling that the term "at least about 160,000" international units per absorption unit (IU/AU) was indefinite. Adopting the district court's reasoning, the Federal Circuit held the claims invalid because the term "about" failed to advise one skilled in the art of the "mean value" between the prior art value of 128,620 IU/AU and the

---

**3.** Dictionaries, although a form of extrinsic evidence, may always be relied on by the court to determine the meaning of the claim terms "so long as the dictionary definition does not contradict any definition found in or ascertained by a

reading of the patent documents." *Vitronics,* 90 F.3d at 1584 n. 6; *see also Interactive Gift Express v. Compuserve, Inc.,* 231 F.3d at 866 n. 1; *Kegel Co., Inc. v. AMF Bowling Inc.,* 127 F.3d 1420, 1427 (Fed.Cir.1997).

"mean specific activity level of 160,000" that would constitute infringement. *Id.* at 1218. Critically, the court noted that the "at least about 160,000" language was added after the examiner rejected "at least 120,000," which the examiner found was anticipated by the prior art. *Id.* at 1218. However, the Federal Circuit stated that, given this prosecution history, the claims would also be invalid without the limitation of "about" and cautioned that its ruling "should not be understood as ruling out any and all uses of this term in patent claims." *Id.* at 1218.

Thus, contrary to defendant's intimations, *Amgen* expressly rejects the sweeping proposition that use of the term "about" renders a claim *per se* indefinite. As further evidence of this, various cases have held claims employing this language to be definite.[4] They teach that the "determination of the 'technological scope' that should be given to the term 'about' is dependent on the context of the use of the term and the precision or significance of the measurements used." *Zoltek Corp.*, 48 Fed.Cl. at 300; *see also Eiselstein v. Frank*, 52 F.3d 1035, 1040 (Fed. Cir.1995) ("[t]he meaning of the word 'about' is dependent on the facts of a case, the nature of the invention, and the knowledge imparted by the totality of the earlier disclosure to those skilled in the art"); *Modine Mfg. Co.*, 75 F.3d at 1554. As noted in a leading treatise:

> The use of the term 'about' permits some leeway in the amount of a required constituent in a claim. Such broadening usages as 'about' must be given reasonable scope;

they must be viewed by the decision maker as they would be understood by persons experienced in the field of the invention. Although it is rarely feasible to attach a precise limit to 'about,' the usage can usually be understood in light of the technology embodied in the invention.

Robert L. Harmon, *Patents and the Federal Circuit* § 5.6(b) at p. 251 (5th ed.2001) (hereinafter Harmon). As such, the term "about" must be given a reasonable scope and be viewed by this court as it would be understood by persons skilled in the field of the invention. *Modine*, 75 F.3d at 1554 (citing *Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819, 821–22 (Fed.Cir.1988)).

Unlike the case in *Amgen*, the pH range specified in the '497 patent was not designed to distinguish this patent from prior art. As such, in the context of this patent, questions such as whether a pH of 4.5 is "about 5" focus solely on what an individual skilled in the art would consider an approximate of 5 in the context of the pH scale, and, more broadly, a waste water treatment method.[5] And what one skilled in the art would consider to be "about 5" in the context of that scale, in which each increasing number represents an order of magnitude, might vary considerably from what that same individual would view as being "about 5" on a scientific scale in which the units of measurement were different (*e.g.,* the Moh scale or the Richter scale). That there inevitably is this variation from scale to scale, however, does not render the claim here indefinite, as illustrated by the

---

4. *See Modine Mfg. Co. v. U.S. Intern. Trade Comm'n*, 75 F.3d 1545, 1554 (Fed.Cir.1996) ("Although it is rarely feasible to attach a precise limit to 'about' the usage can usually be understood in light of the technology embodied in the invention."), *cert. denied*, 518 U.S. 1005, 116 S.Ct. 2523, 135 L.Ed.2d 1048 (1996); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1557 (Fed.Cir.1983) (descriptive term "about," when used to describe ranges in a patent, does not render a claim indefinite), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *CPC International Inc. v. Archer Daniels Midland Co.*, 831 F.Supp. 1091, 1110 (D.Del.1993) ("In the context of determining an appropriate tip speed for a particular vessel and agitator, a person skilled in the art would not find the term 'about 600 cm/sec' to be unclear."), *aff'd*, 31 F.3d 1176 (Fed.Cir.1994), *cert. denied*, 513 U.S. 1184,

115 S.Ct. 1176, 130 L.Ed.2d 1129 (1995); *Zoltek Corp.*, 48 Fed.Cl. at 300 ("The Court does not agree with Defendant's contention that a precise limit must always be attached to the term 'about.' "); *Syntex (U.S.A.), Inc. v. Paragon Optical Inc.*, 7 U.S.P.Q.2d 1001, 1038 (D.Ariz.1987) (" 'About' is not broad or arbitrary but rather is a flexible term with a meaning similar to 'approximately.' ").

5. In addition to *Amgen*, defendant relies heavily on this court's decision in *Exxon Research and Engineering Co. v. United States*, 46 Fed.Cl. 278 (2000), which held that a patent which used "words of degree" was invalid. That case, however, was subsequently reversed by the Federal Circuit. *See Exxon Research and Engineering Co.*, 265 F.3d 1371 (Fed.Cir.2001).

fact that the Federal Circuit has, on several occasions, construed the scope of a range of "about" numbers in determining whether a patent was infringed. *See, e.g., Conopco Inc. v. May Dep't Stores Co.,* 46 F.3d 1556, 1561 (Fed.Cir.1994), *cert. denied,* 514 U.S. 1078, 115 S.Ct. 1724, 131 L.Ed.2d 582 (1995). Indeed, given that this patent prescribes a method for dealing with a wide range of contaminated waste water streams, some imprecision in the actual range of pH necessary to precipitate out the contaminants seemingly would be anticipated by one skilled in the art—a point ultimately confirmed by expert testimony in this case.[6]

### 3. Claim 1: "aerated in said reaction tank to provide a dissolved oxygen concentration at from about 0.01 lb./hr. to about 70 lbs./hr."

 This court ruled that this language, considered in conjunction with that portion of the claim that recites gallonage and milligram ranges, refers to a rate of aeration and that the ranges so specified were not intended as limitations on the patent. This court thereby rejected defendant's assertion that this language was indefinite.

To be sure, the disputed language is not a picture of clarity. It might be viewed as referring to a particular oxygen concentration or as indicating that the aerator should possess a particular rating—references in the specifications, indeed, suggest both interpretations. But, the interpretation that makes the most sense, and which is most consistent with the intrinsic evidence, as a whole, is that the language refers to a rate of aeration. Thus, the detailed description of the patent indicates that "[t]he rate of aeration would normally be from about 0.01 lbs./hr. to about 70 lbs./hr. for a metals concentration of 50 mg./l. to 1,000 mg./l. at a raw water input flow rate of 50 gal./min. to 500 gal./min." This language in the specification tracks the prosecution history, which reveals that the claim language was an amendment to the patent. By way of explaining this amendment, the

wrapper includes a letter from the applicant's attorney, which states:

> The applicant wishes to make of record that the undersigned attorney and the Examiner agreed during their telephone interview that the purpose of aeration and flow rate limitations added by the amendment to step (c) of claim 1 was to define a range of dissolved oxygen concentration for the metals concentration which would result form [sic] the recited ratios of aeration and flow rate limitations. The intention of this language was not to limit the application of this claim to any particular waste water flow rate such as 50 gal./min to 500 gal./min.

Thus, the available intrinsic evidence supports the interpretation that the language in question, combined with the associated ranges for metal concentrations and flow rates, defines a rate of aeration.

Support for this interpretation is also found in the extrinsic evidence received by the court. Both plaintiffs' expert, Dr. Roth, as well as defendant's expert, Mr. Dupon, testified that if one skilled in the art knew the water input flow rate and the nature and extent of the metals concentration, he or she could adjust the rate of aeration to generate an optimum dissolved oxygen concentration—one that would maximize the efficiency of the reaction. Dr. Roth further indicated that "one skilled in the art would conclude that the range relates to the rate of aeration, that will supply the needed oxygen concentration to effect an appropriate reaction based upon the influent flow rate," noting further that "[o]ne skilled in the art ... could easily calculate the equivalent oxygen concentration based upon the rate of aeration." For his part, Mr. Dupon rejected the idea that the referenced language referred to a particular dissolved oxygen concentration or a particular aerator rating. Instead, he candidly agreed that the most likely interpretation of the language was as a reference to a rate of aeration—one that would lead to proper oxidation of the waste stream. Mr. Dupon, however, discounted this interpreta-

---

6. Thus, at one point during the *Markman* hearing, defendant's expert, Mr. Dupon testified, at some length, regarding the type of bench testing that he would employ to determine the optimal

pH for metal precipitation and noted that the amount of testing would depend on the constituent metals in a particular acid mine waste water stream.

tion based on his view that one skilled in the art would recognize that some waste water metal contaminants might not need to be aerated at all to be precipitated. In his testimony at the *Markman* hearing, however, he never suggested that the presence of some minimal amount of oxygen, *e.g.*, that obtained at an oxidation rate of 0.01 lbs per hour, would prevent the precipitation of such contaminants. Consequently, on the whole, even Mr. Dupon grudgingly agreed that the most likely interpretation of the language in question was that it referred to a rate of aeration.

Overall, the court believes that the intrinsic evidence is adequate to demonstrate that the language in questions refers to a rate of aeration to be determined by one skilled in the art once other variables, including the rate of flow of the waste water and the chemical composition thereof, were determined. And though not determinative, it is noteworthy that that intrinsic evidence is also supported by expert testimony.

### C. Other Claims Construed

#### 1. '497 Patent

At the outset, it should be noted that plaintiffs and defendant agreed as to the construction of various claims in the '497 patent. Based upon those agreements, the court construed the relevant claims, as follows:

| CLAIM | CONSTRUCTION |
|---|---|
| Claim 1: "means" elements | means-plus-function elements and limited to the corresponding structure described in the specification and equivalents thereof |
| Claim 1: "aerator means having a shaft extending therefrom into said reaction vessel said shaft having a discharge end for discharging oxidant, said aerator means having agitation means." | means-plus-function elements, construed together, corresponding to motor 6, shaft 15, aerator prop16 and discharge tip 17 in Figure 3, with aerator prop 16 providing agitation |
| Claim 1: "a neutralizing agent feed line means … for delivering neutralizing agent" | means-plus-function element, describing the function of delivering the neutralizing agent and corresponding to caustic feed line 19 |
| Claim 1: "pump means operatively associated with said reaction vessel" | means-plus-function element, describing the function of pumping the caustic and corresponding to metering pump 12 |
| Claim 1: "power source means operatively associated with said reaction vessel for energizing said apparatus" | means-plus-function element, describing the function of energizing the apparatus and corresponding to a portable generator or line power |
| Claim 1: "effluent discharge pipe means operatively connected to said reaction vessel for discharging the water" | means-plus-function element, describing the function of discharging the water and corresponding to effluent conduit 11 |
| Claim 3: "means for receiving precipitants from said mixture" | includes a thickener, a clarifier, and a settling pond |
| Claim 3: other "means elements" | Definite |
| Claim 3: "generally adjacent" and "generally the same point" | Definite |
| Claim 5: "substantially simultaneous" | Definite |

Regarding the construction of other claims in the '497 patent on which the parties disagreed, the court's rationale for its prior oral ruling is, as follows:

#### (i) Claim 1: "neutralizing supply means."

The court ruled that this phrase is not indefinite and that the structure associated

therewith is "a container containing a caustic, usually liquid, that is exterior to the tank, is portable and readily moveable, and is connected to the caustic feedline 19." In arguing that this element of the claim was indefinite, defendant noted that the drawings do not indicate the "caustic supply means" and reasoned that "no person skilled in the art can discern whether the 'neutralizing supply means' is a tank of caustic, a caustic generating machine, or something else." Adverting to *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374 (Fed.Cir.1999), defendant contended that absent the disclosure of a structure, it is impossible for a person with ordinary skill in the art to understand the breadth of the disputed language, thereby making claim 1 indefinite.

To be sure, in *Atmel, supra,* the Federal Circuit emphasized the importance of having a means-plus-function associated with a structure. *Atmel,* 198 F.3d at 1380. The court, however, did not hold that the structure had to be depicted in a figure accompanying the specification. Rather, in commenting on the particularity requirement, it noted, with approval, the portion of the Patent and Trademark Office's Supplemental Examiner Guidelines which indicates:

> The written description does not have to explicitly describe the structure (or material or acts) corresponding to a means (or step-) plus-function limitation to particularly point out and distinctly claim the invention as required by 35 U.S.C. 112 ¶ 2. Rather, disclosure of structure corresponding to a means-plus-function limitation may be implicit in the written description if it

would have been clear to those skilled in the art what structure must perform the function recited in the means-plus-function limitation.

*Atmel,* 198 F.3d at 1380 (quoting PTO Supplemental Examiner Guidelines on Applying 35 U.S.C. § 112 ¶ 6, 58 Fed.Reg. 443, 444 & nn. 12 & 13 (1999)). Guided by these standards and its prior decision in *In re Dossel,* 115 F.3d 942, 946–47 (Fed.Cir.1997), the *Atmel* court emphasized that the essence of the structure requirement is that "the corresponding structure(s) of a means-plus-function limitation must be disclosed in the written description in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation." *Atmel,* 198 F.3d at 1382; *see also S3 Inc. v. nVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed.Cir.2001).

 Thus, in order for a means-plus-function limitation to meet the particularity requirement of § 112 ¶ 2, the written description need not identify a particular structure in a figure that is associated with the claim, provided adequate disclosure for one skilled in the art is otherwise made. Bringing this standard closer to home, the court finds that the patentees here adequately disclosed sufficient structure in the specification to give meaning to the phrase "neutralizing supply means." Thus, the specification indicates that the "caustic feed line 19 connects caustic supply means (not shown) to the reaction vessel 4." It also notes repeatedly that the "apparatus of the invention" is "portable," thereby suggesting that the "neutralizing supply means" must also be portable.[7]

---

7. A further word on this feature of "neutralizing supply means" is warranted. As defendant point out, none of the claims of the patent indicate that the apparatus for treating the acidic water is actually portable. However, the specifications to the patent emphasize the portability of the system at two places, indicating that Figure 1 depicts a "portable mine acidic treatment apparatus" and noting that "[t]he unit can be readily transported." The specifications thereby reveal that the structure corresponding to the "neutralizing supply means" must be portable. *See Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.,* 74 F.3d 1216, 1219–1220 (Fed.Cir.1996) ("body attaching means" did not include devices with "bulky locking screw," where specification of patent indicated that the overall apparatus for the patent has "minimum bulk"). Moreover,

further resort to the specification discloses several disadvantages of the prior art regarding the treatment of mine drainage, noting, for example, that "known methods involve large machinery which is not easily transportable." To overcome these disadvantages, the preamble to the patent, as well as the summary of the invention, repeatedly emphasizes that the apparatus associated with the patent is portable. In this court's view, these references expressly exclude from the meaning of the "neutralizing supply means" a structure that is not relatively portable. *See Ballard Medical Products v. Allegiance Healthcare Corp.,* 268 F.3d 1352, 1359 (Fed.Cir.2001) (noting that statements detailing the shortcomings of relevant prior art are often useful in construing means-plus-function claims); *Tronzo v. Biomet,*

Further, the specification discloses that the neutralizing substance is a caustic (*e.g.*, "[a] caustic substance is injected into the system which neutralizes the acid in the water"), which defendants admits one skilled in the art would know would usually be a liquid.[8] Finally, it is evident that if the neutralizing supply is either a liquid, or even a gas, it must be in some sort of a container. Combining all of these elements together led the court to conclude that one skilled in the art would know that the structure needed to perform the function recited in this means-plus-function is "a container containing a caustic, usually liquid, that is exterior to the tank, is portable and readily moveable, and is connected to the caustic feedline 19." Accordingly, despite the fact that this structure is not shown in the figures in the patent, the court finds that the phrase "neutralizing supply means" meets the particularity requirement in section 112, paragraph (6) and, therefore, is definite.

*Inc.*, 156 F.3d 1154, 1159 (Fed.Cir.1998) (holding that a written description did not support claim construction covering conical and non-conical shaped cups where the specification distinguished prior art non-conical shaped cups as inferior and touted the advantages of the conical shape of the patented cup), *cert. denied,* —— U.S. ——, 122 S.Ct. 580, 151 L.Ed.2d 451 (2001).

### (ii) Claim 1: "automated metering and control means."

The court likewise ruled that this element is not indefinite and refers to the metering pump 12 and control panel 13 in the accompanying Figure 2 of the patent. Defendant argued that this means clause is indefinite.

This means clause has two functions—"delivering said neutralizing agent into said reaction vessel through the neutralizing agent feed line means" and delivering "oxidant from said aerator means at substantially the same time." Defendant admitted that the first of these functions is performed by metering pump 12, but asserted that no structure was disclosed which might perform the second of these functions, that is, delivering the oxidant from the aerator at substantially the same time. Regarding the structures associated with this means clause, the patent's description of the preferred embodiment provides:

8. Indeed, in pressing its view of claim 9 of the patent, the government essentially admitted that the neutralizer employed in the process must be a caustic. *See* discussion, *infra*, at part III.C.1.v.

Patent 497 Figure 2

FIG. 2 shows metering pump 12, which is used to control the amount of fluid introduced into the system. Control panel 13 is used to monitor flow of fluids into the system.... The metering pump through a pH monitoring device maintains a proper pH level for the effluent.

From this description, it is evident that the "automated metering and control means" also includes control panel 13.

At first blush, the role played by the control panel 13 in monitoring the delivery of the oxidant from the aerator is somewhat obscure. The description of the control panel quoted above anticipates that panel would monitor the "flow of fluids," and other claims in the patent, as well as the specification, teach that many of the oxidants anticipated to be used in the processes are gases, such as air. However, Dr. Roth, clarified that one skilled in the art would know that the phrase "fluids" refers not only to liquids, but also to gases. And, his view is in accord with the common definition of the term "fluid," which encompasses both liquids and gases. *See The American Heritage Dictionary of the English Language* 677 (4th ed.2000) ("A continuous, amorphous substance whose molecules move freely past one another and that has the tendency to assume the shape of its container; a liquid or gas"); *see also In re Smythe*, 480 F.2d 1376, 1383 (C.C.P.A.1973) (fluid includes both gas and liquid). Accordingly, contrary to defendant's claims, the patent does reveal control structures that perform the function of delivering the oxidant from the aerator means, *to wit*, the metering pump 12 and control panel 13.

(iii) Claim 2: "The apparatus of Claim 1 wherein said influent pipe is disposed closely adjacent to the discharge end of said aeration shaft whereby the relative general proximity of said water source means said neutralizing agent feedline discharge end and said agitation means will enhance the efficiency of the reaction."

■ In its oral ruling, this court held that this claim is definite and was depicted in Figure 3 of the patent. Defendant had argued that the phrase "closely adjacent" lacked any defined meaning and, therefore, was indefinite. It asserted that while Figure 3 of the patent provided a preferred embodiment—an example of how one might achieve general adjacency—it did not cure the indefiniteness problem because the parameters of such adjacency still were undefined.

In the courts' view, the phrase "closely adjacent" has an ordinary, accepted meaning that is not varied by the patent. The dictionary defines the term "adjacent" as "close to; lying near" or "next to; adjoining," and defines the adjective "close," the root for the adverb "closely," as "being near in relationship" and "having little or no space between elements or parts." *See The American Heritage Dictionary of the English Language* 21, 349 (4th ed.2000). These words, taken in combination, thus suggest that the influent pipe has an endpoint not distant from the discharge end of the aerator shaft. To be sure, this terminology does not require a particular orientation (*e.g.*, a 45° angle), nor a specific distance between the endpoint (*e.g.*, 6 inches). Yet, in the court's view, one skilled in the art would know what was meant by this language.[9] This is particularly so as other language in the patent emphasizes that a key object of the patent is to introduce the water, the neutralizer and the oxidant at essentially the same point and time in the process flow. Thus, in the description of the preferred embodiment, the patent indicates that "[t]he neutralization means and the aeration means are in generally close proximity and oriented in generally the same axial position." Finally, it bears noting that the orientation of the influent pipe to the aerator depicted in figure 3 provides further support for this court's construction of the "closely adjacent" language.[10]

(iv) Claim 3: "means for introducing a source of acidic or metal-bearing water into a treatment unit."

■ This court ruled that this element of claim 3 is definite and is a means-plus-function associated with influent conduit 9, conduit 18 and conduit 22 in Figure 3 of the patent. Defendant had argued that the structure associated with this function could not be the "influent pipe means" (*i.e.*, structures 9 and 18) because that structure is already claimed and performs the same function.

■ In the court's view, however, there is nothing inconsistent with some of the structures associated with the "influent pipe means" also serving as a "means for introducing a source of acidic or metal-bearing water into a treatment unit." To be sure, as defendant points out, the doctrine of claim differentiation states that different claims should be presumed to have different scope, which "means that an interpretation of a

9. *See Andrew Corp. v. Gabriel Electronics, Inc.,* 847 F.2d 819, 821 (Fed.Cir.1988) (holding phrases such as "closely approximate" and "close to" are "ubiquitous in patent claims" and not indefinite when "serving reasonably to describe the claimed subject matter to those of skill in the field of the invention"); *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1546–47 (Fed.Cir.1984) (same conclusion as to words "close proximity"); *see also* Peter D. Rosenberg, Patent Law Fundamentals § 14.06[5][c] (2d ed.2001).

10. Court decisions acknowledge that drawings in the patent may be used to construe claims. 5A Donald S. Chisum, *Chisum on Patents* § 18.03[2][c][ii] (2001); *see also, e.g., Overhead Door Corp. v. Chamberlain Group, Inc.,* 194 F.3d 1261, 1268 (Fed.Cir.1999) ("To interpret the term 'switch' consistently in the claim and to harmonize the drawing depiction with the claim language, this court confirms the district court's reading of the term 'switch.' "); *CVI/Beta Ventures, Inc. v. Tura LP,* 112 F.3d 1146, 1153 (Fed. Cir.1997) ("The claims of the '112 and '955 patents do not define the terms 4% and 3% 'elasticity.' ... In that regard, the patent drawings are highly relevant in construing the elasticity limitations of the claims.").

claim should be avoided if it would make the claim read like another one." *Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 404 (1967). However, claim differentiation is not a "hard and fast rule of construction," *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed.Cir.2000) (citations and quotation marks omitted), and does not inflexibly command a particular interpretation. *See also Bristol–Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1376 (Fed.Cir.2001). Common sense, not entirely out of place even in this complex legal context, suggests that in some instances a single structure can perform multiple functions—a pipe, for example, can serve both to transfer liquid from one point to another while also separating that liquid from other material during transit. Bearing out this intuition, both the Federal Circuit and this court have concluded that, providing no ambiguity is introduced, the same structure may perform more than one task and thus correspond to two or more differently-worded mean-plus functions. *See Davies v. United States*, 31 Fed.Cl. 769, 775–76 (1994) (finding two means-plus function claims associated with a single disclosed structure); *see also Ballard Medical Products*, 268 F.3d at 1361; *Caterpillar Inc. v. Deere & Co.*, 224 F.3d 1374, 1377 (Fed.Cir.2000).

But even if the doctrine of claim differentiation were otherwise, there is not a complete identity between the "influent pipe means" and the "means for introducing a source of acidic or metal-bearing water into a treatment unit." Rather, the former is subsumed within the latter. Thus, while items 9 and 18 serve as the corresponding structures for both portions of claim 1 and the means-plus-function in claim 3, the latter function also appears to be associated with item 22 of Figure 3, which, according to the specification, is the "conduit" which "sends the mixture to an area of the tank that may contain internal baffles." That the latter area of the tank is also part of the treatment unit is made clear in Figure 1 of the patent, which, in combination with the description of the preferred embodiment, indicates that the entire tank constitutes the "treatment unit."

(v) **Claim 9: "wherein the pH is substantially instantaneously elevated."**

■ In its oral ruling, this court construed this phrase to mean "a level of pH elevation caused by introduction of a caustic, *e.g.*, sodium hydroxide, potassium hydroxide, magnesium hydroxide, barium hydroxide, and combinations thereof." Defendant asserts that this phrase, in essence, means that the claim requires a neutralizing agent that would act the quickest and cause the pH to rise the fastest. Although defendant does not assert that this claim, if interpreted in this fashion, is indefinite, it does suggest that if the claim is not so interpreted, the use of the term "substantially" would render the claim indefinite.

Defendant's argument, however, rests on the mistaken premise that the use of the word "substantially" inevitably introduces fatal ambiguity into a claim. Not so. Rather, words of degree are entirely appropriate "when serving reasonably to describe the claimed subject matter to those of skill in the field of invention, and to distinguish the claimed subject matter from the prior art." *Andrew Corp.*, 847 F.2d at 821. And this court has held that words of degree may be used "to prevent the avoidance of infringement by minor changes that do not affect the results sought and accomplished." *C.E. Equipment Co., Inc. v. United States*, 17 Cl.Ct. 293, 299 (1989); *see also Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 133 F.Supp.2d 843, 861 (E.D.Va.2001). Consistent with this view, in *York Products, Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568 (Fed.Cir. 1996), the Federal Circuit held that the use of the word "substantial" did not render a claim indefinite. Noting that the "patent discloses no novel use of claim words," the court accorded the word "substantially" its normal meaning, stating: "ordinarily, therefore, 'substantially' means 'considerable in ... extent, ..., or largely but not wholly that which is specified.'" *Id.* at 1572–73; *see also LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1354 (Fed. Cir.2001); *Seattle Box Co., Inc. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 829 (Fed.Cir.1984); *C.E. Equipment Co.*, 17 Cl.

Ct. at 299 ("the term 'substantially' in patent claims gives rise to some definitional leeway.... Patentees may use these terms to avoid unduly limiting the modified word. Thus, the term 'substantially' may prevent avoidance of infringement by minor changes that do not affect the results sought and accomplished.").

In the instant case, there is no indication that the patent assigned a special meaning to the term "substantially," and, as such, the phrase "substantially instantaneously" simply means that the elevation of the pH is nearly instantaneous. The specification to the patent makes clear that the neutralizer intended to cause such a reaction is a caustic and that examples of such a caustic include "sodium hydroxide, potassium hydroxide, and mixtures thereof." Expert testimony at trial further verified that one knowledgeable in the art would know at least two other caustics that would produce the required elevation of the pH—magnesium hydroxide and barium hydroxide. Accordingly, the court concluded that the disputed language in claim 9 should be interpreted to refer to the elevation of pH that would occur upon the introduction of a caustic, giving as examples thereof sodium hydroxide, potassium hydroxide, magnesium hydroxide, barium hydroxide, and combinations thereof.

## 2. '800 Patent

At the outset, it should be noted that plaintiffs and defendant agreed as to the construction of various claims in the '800 patent. Based upon those agreements, the court construed the relevant claims, as follows:

| CLAIM | CONSTRUCTION |
| --- | --- |
| Claim 1: "metal compounds" | "precipitated or suspended compounds of metal" |
| Claim 1: "selected from iron, manganese, aluminum, zinc, copper, lead, arsenic, and chromium" | "selected from iron, manganese, aluminum, zinc, copper, lead, arsenic, and chromium, either alone or in combination with themselves or other materials and in any initial form so long as they are precipitated or suspended" |
| Claim 1: "comprising" | "comprising at least" |
| Claim 1: "agitating the waste water" | includes agitation by any means, including by aeration and by a mixer |
| Claim 1: "flocculating agent polymer" | includes a polyelectrolyte |
| Claim 1: "a group consisting of cationic and anionic polymers" | limited to cationic and anionic polymers but includes any cationic or anionic polymer |
| Claim 2: "further dewatering the floccules separated in step (e)" | "processing the floccules separated in step (e) in a second or later stage" |
| Claim 9: "polishing means" | limited to a polishing pond, a settling pond, and a polishing tank, and their equivalents |
| Claims 21: "used for primary clarification purposes" | "in a first stage clarifier" |
| Claims 22: "used for settling purposes" | "in a settling pond or tank" |

Regarding the construction of the remaining claims in the '800 patent on which the parties disagreed, the rationale for the court's prior oral ruling is, as follows:

### (i) Claim 1: "aerating the water."

 The court construed this phrase to mean "supply air and other gaseous oxidants to the waste water." Defendant argued that this element in claim 1 does not include forms of oxidation other than introducing air.

However, the '497 patent, which is the preferred embodiment for this portion of the '800 patent, envisions the use of other gaseous oxidants (*e.g.*, ozone).[11] As such, absent extraordinary evidence to the contrary (of which, there is none, let alone, clear and convincing evidence), the phrase "aerating the water," as used in the '800 patent, must be construed to include the preferred embodiment and, therefore, to cover the introduction not only of air, but other gaseous oxidants, into the waster water stream. *See Vitronics Corp.*, 90 F.3d at 1583 (a claim construction that would exclude the preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support"); *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1580–81 (Fed. Cir.1996) (refusing to adopt a claim construction of "stable" that would exclude the preferred embodiment disclosed in the specification); *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed.Cir.2001) (citing cases). This construction is bolstered by several dictionary definitions of the term "aeration." *See, e.g., The American Heritage Dictionary of the English Language* 3 (4th ed.2000) ("[t]o supply or charge (liquid) with a gas"). Based on this evidence, the court need not tarry and rejects defendant's cramped interpretation of this element.

#### (ii) Claim 1: "about 50 gal./min. to 500 gal./min." and "about 50 mg./1 to about 1,000 mg./1."

As discussed above, the court believes that these ranges, when viewed in conjunction with the ranges of dissolved oxygen concentration indicated in the patent, allow for the calculation of a rate of aeration and are not intended as limits on the patent involving certain flow rates or metal concentrations.

Apart from the prosecution history discussed above, further indication of this may be found in the example in the specification, which refers to a waste water stream having a "dissolved metal concentrations of 10,000 ppm." Were defendant correct, the example, which corresponds to 10,000 mg./1., would be outside the limits supposedly prescribed in claim 1—a construction, however, that would be disfavored. *See Vitronics*, 90 F.3d at 1583

#### (iii) Claim 23: "adding in a dilute concentration of from about 0.5% to about 1.5% by weight."

■ At the *Markman* hearing, this court reserved ruling on defendant's assertion that this claim is indefinite. Defendant offered two reasons for its assertion: First, it noted that the phrase "added in dilute concentration" does not specify at what stage in the method the polymer is being added. According to defendant, the claim also fails to specify whether the cited concentration refers to the dilution of the polymer prior to being added to the waste water or to the concentration of the polymer in relation to the waste water stream. Second, defendant again demurred to the use of the word "about," indicating that usage deprives the range of any specificity. Plaintiffs countered that the patent, at various points, specifies the addition points for the polymers and that one skilled in the art would know that the dilute concentration refers to the dilution of the polymer prior to being added to the system. They further contended that one skilled in the art would know that some level of experimentation would be required to select the proper polymer, dosage and dilution to deal with a particular waste stream.

---

11. While claim 3 of the '497 patent refers to the aeration process, claim 4 of that patent also claims "[t]he method of claim 3, wherein said primary oxidant source is air." The latter claim suggests that the aeration discussed in claim 3 of the '497 patent could be accomplished using a gas other than air. *See Zoltek*, 48 Fed.Cl. at 293–94 ("When an inventor uses different words or phrases in separate claims, the claims are presumed to have different meanings and scope so that limitations stated in dependent claims are not to be read into the independent claim from which they depend."). The description of the preferred embodiment in the '497 patent, indeed, makes this explicit, indicating:

In addition, the possibility exists that ozone, alone or with different reagents such as hydrogen peroxide, can be combined in the same manner to expand the environment in which this invention may be used. That is, other environments and other types of chemicals for treating various types of pollutants are contemplated as within the scope of the claimed invention.

Claim 1, on which claim 23 is dependent, indicates that the "flocculating agent polymer" is added to the waste water after the pH of the water is adjusted and the water is aerated and agitated. Consistent with this claim, the accompanying Figure 1 depicts a polymer tank 24 that eventually connects with rotary drum 22, immediately after the water leaves the reaction tank in which it is neutralized and aerated. To be sure, claim 2 of the patent, which is also dependent on claim 1, describes a process whereby there is further dewatering of the floccules separated in claim 1, and claim 3, which is dependent on claim 2, describes the method of claim 2 "wherein additional flocculating agent polymer is added to at least a portion of the waste water." Likewise, claim 11 effectively is dependent on claim 1 and describes a method where "additional flocculating agent polymer is added after the clarifier and then again after the rotary drum thickener." But, significantly, claim 23 is neither dependent upon claim 2 or 3, nor claim 11, and thus does not incorporate the possibility of a second point for the introduction of the polymer. As such, in the court's view, one skilled in the art would know where the polymer referred in claim 23 was to be introduced in the method described by claim 1.

Patent 800 Figure 1

In addition, the court rules that the dilution referred to in claim 23 is that of the polymer before, rather than after, it is added to the waste water stream. This conclusion most naturally proceeds from the language of the claim which refers to the polymer being added "in a dilute concentration of from about 0.5% to about 1.5% by weight." Indeed, nothing in the patent or its prosecution history suggests any limitations addressed to the weight of polymer that would be added into the waste water stream. Moreover, various extrinsic evidence offered by the parties, including expert testimony, indicates that polymers are traditionally marketed in concentrated form and each comes with a recommended dilution rate—the amount of water to be added before the polymer is used. Dr. Roth testified that the range of dilution specified in claim 23 was a "typical range" for diluting polymers. This industry practice, of course, is consistent with an interpretation of this claim that specifies the dilution of the polymer before it is added to the waste wa-

ter. Defendant has not provided clear and convincing evidence to the contrary.

Finally, for reasons similar to those described above, the court also does not believe that the use of the term "about" renders claim 23 indefinite. Rather, the court believes that one skilled in the art would view the term "about" as indicating "approximately."

\* \* \* \* \* \*

That ends this phase of our journey. With these definitional building blocks in place, the court moves to defendant's arguments challenging the validity of the subject patents.

## III. VALIDITY OF PATENTS

We begin with familiar fare: patent claims are presumed valid, 35 U.S.C. § 282 (2001), and the burden of establishing to the contrary rests on the party asserting invalidity, who must prove the facts supporting invalidity by clear and convincing evidence. *See Georgia–Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1330 (Fed.Cir.1999), *cert. denied*, 531 U.S. 816, 121 S.Ct. 54, 148 L.Ed.2d 22 (2000); *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997). The court will consider defendant's challenges to the validity of the '497 and '800 patents *seriatim*.

### A. '497 Patent

Defendant contends that the claims of the '497 patent fail to meet various statutory requirements in the Patent Act. Specifically, it asserts that claims 1 and 2 of the '497 patent are invalid on grounds of obviousness under 35 U.S.C. § 103(a), and that claims 3 through 9 of the '497 patent are invalid not only for obviousness, but also for lack of enablement under 35 U.S.C. § 112 ¶ 1.

### 1. Is the '497 Patent Obvious?

■ A patent is invalid for obviousness when differences between its claims and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (2000). While the ultimate determination whether an invention would have been obvi-

ous is a question of law, this conclusion is based on the totality of the evidence and informed *vel non* by four underlying factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) any objective evidence of nonobviousness, such as long felt need, commercial success, the failure of others, or copying. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1124 (Fed.Cir.2000). The so-called *Graham* factors guide in determining "whether the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in the light of the prior art." *Brown and Williamson Tobacco Corp.*, 229 F.3d at 1124 (quoting *In re Dow Chem.*, 837 F.2d 469, 473 (Fed.Cir. 1988)). Defendant must prove these factual predicates by clear and convincing evidence. *See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 767 (Fed.Cir.1988), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989); *Estate of Wicker*, 43 Fed.Cl. at 181.

Defendant asserts that the critical elements in the claims of the '497 patent were all shown in the prior art and that it would have been obvious to one skilled in the art in January 1986 to alter or combine the prior art so as to produce the '497 patent. The court will analyze these assertions, and plaintiffs' responses thereto, in the context of the four *Graham* factors identified above. *See Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 663–64 (Fed.Cir.2000) (noting the need for the court to make specific findings with respect to the four *Graham* factors in determining obviousness).

### (i) The scope and content of the prior art

■ The scope of the relevant prior art includes that " 'reasonably pertinent to the particular problem with which the inventor was involved.' " *In re GPAC Inc.*, 57 F.3d 1573, 1577 (Fed.Cir.1995) (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1535

(Fed.Cir.1983)). "References that are not within the field of the inventor's endeavor may also be relied on in patentability determinations, and thus are described as 'analogous art', when a person of ordinary skill would reasonably have consulted those references and applied their teachings in seeking a solution to the problem that the inventor was attempting to solve." *Id.* at 1578 (quoting *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.,* 21 F.3d 1068, 1071 (Fed.Cir.1994) (citation omitted)); *see also Harmon* at § 4.4, p. 158. With respect to prior art, "[w]hile a reference must enable someone to practice the invention in order to anticipate under § 102(b), a nonenabling reference may qualify as prior art for the purpose of determining obviousness under § 103." *Symbol Technologies, Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1578 (Fed.Cir. 1991).

In the case *sub judice,* defendant challenges claim 1 of the '497 patent as obvious, advancing that every element thereof is found in the prior art references of U.S. Patent No. 4,652,381 ("Inglis"), U.S. Patent No. 4,240,990 ("Inhofer"), and *Design Manual: Neutralization of Acid Mine Drainage,* published by the EPA in January, 1983 (the "EPA Manual"). Likewise, defendant asserts that claim 2 of the '497 patent is obvious because of the prior art reference of *In-Line Aeration and Treatment of Acid Mine Drainage,* United States Department of the Interior Bureau of Mines Report of Investigations number 8868, by T.E. Ackman and R.L.P. Kleinman, published in 1984 ("Ackman"). Finally, defendant asserts that claims 3 through 9 of the '497 patent are obvious in light of Inglis, Inhofer, and the EPA Manual.

While plaintiffs admit that the references cited by defendant are prior art, they assert that art is not analogous. *Per contra.* Based upon the testimony received, the court concludes that the referenced prior art would have been consulted by a person of ordinary skill attempting to solve the problem surmounted by the '497 patent. For example, while Inglis does not involve mine waste water treatment, it does involve the treatment of industrial waste water contaminated by metals to lower the concentrations thereof to levels permitting discharge of the water to a sewer. Moreover, the contaminating metals involved in Inglis—lead, iron, copper and zinc—are among those covered by the '497 patent. Similarly, Ackman discusses the treatment of acid mine drainage using aeration, a concept that various witnesses confirmed is related to the '497 patent. Indeed, Ackman acknowledged the contributions of Messrs. Simonetti and Kanzleiter, two of the inventors of the '497 patent, for their role in developing aeration devices for treating mine waste water. Based on this evidence and other evidence in the record, the court concludes that the prior art identified by defendant is analogous and thus relevant to the obviousness inquiry here.

### (ii) The level of ordinary skill in the prior art

The person of ordinary skill in the art is a legal construct—a hypothetical person who is placed in the position of being aware of all of the relevant prior art. *Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.,* 807 F.2d 955, 962 (Fed.Cir.1986). In determining this individual's level of skill, a court may consider several factors, including the kinds of problems existing in the art, the known solutions to the problems, the rate at which new inventions are made in the field, the complexity of the technology and the educational level of active workers in the field. *Id.; see also Gargoyles, Inc. v. United States,* 32 Fed.Cl. 157, 165 (1994), *aff'd,* 113 F.3d 1572 (1997). Not all such factors may be present in every case, and one or more of them may predominate. *Custom Accessories,* 807 F.2d at 962–63; *see also In re GPAC, Inc.,* 57 F.3d at 1579. Notably absent from this list is the level of skill of the inventors of the patents, which is generally not determinative. *See Helifix Ltd. v. Blok–Lok, Ltd.,* 208 F.3d 1339, (Fed.Cir.2000); *Custom Accessories,* 807 F.2d at 962.

According to the expert testimony in this case, a person of ordinary skill in the art with respect to the '497 patent and analogous prior art would be one who has a combination of training and experience that allows him or her to understand the various processes that

are described in the patent, including pH adjustment, oxidation, aeration, mixing, sedimentation, and solids de-watering. Such an individual could be one with ordinary skill in the art even if he or she understood these processes not in the context of mine waste water, but in dealing with other forms of industrial and municipal waste water. One skilled in the art, however, would know that the constituency and concentrations of metals in acid rock drainage can fluctuate at a particular site and, assuredly, is different from site to site. As such, testimony confirmed that such an individual would be able to conduct laboratory analysis (*e.g.*, bench scale tests or jar tests) designed to fine tune the chemistry that would be needed to deal with a particular waste stream. According to that testimony, the ability to conduct such testing, which could range, in duration, from several hours to several weeks, is essential to determining the optimum conditions for precipitating the metals, using a combination, in particular, of various neutralizers and polymers, and dilutions thereof. Finally, one skilled in the art would be knowledgeable about solubility curves based on thermodynamic equilibrium data and under which conditions precipitation would be optimum.[12]

### (iii) The differences between the claimed invention and the prior art

Although the four *Graham* factors indisputably form the skeletal framework of the obviousness analysis, the backbone of that analysis, certainly in the instant case, is the comparison of the claimed invention with the prior art. *Graham,* 383 U.S. at 17, 86 S.Ct. 684. Regarding this third, often decisive, *Graham* factor, the Federal Circuit has stated that "whether obviousness is established by combining the teachings of the prior art, 'the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.'" *GPAC,* 57 F.3d at 1581 (quoting *Cable Elec. Prods., Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1025 (Fed.Cir. 1985) (citation omitted)). Reiterating this concept, the court more recently opined: "[w]hen a patent describes a new mechanical device that can be viewed as a new combination or arrangement of mechanical components, the legal conclusion of obviousness requires that there by some suggestion, motivation, or teaching in the prior art whereby the person of ordinary skill would have selected the components that the inventor selected and used them to make the new device." *C.R. Bard, Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1351 (Fed.Cir.1998) (citing cases). In such circumstances, in order to find obviousness, the combined teachings of the prior art must suggest the improvements embodied by the invention. *In re Sernaker,* 702 F.2d 989, 994 (Fed.Cir.1983).

**Claim 1.** Relying principally on Mr. Dupon's testimony, defendant first asserts that every element of claim 1—starting with the source of acidic or metal-bearing water and ending with the effluent discharge pipe—is shown in Inglis except for two elements: the "power source means" and the "agitation means."[13] Defendant asserts that the addi-

---

12. There was some debate at trial as to whether one skilled art would need to possess particular academic degrees. To be sure, defendant's expert, Mr. Dupon, indicated in his report that certain degrees would be required. However, his testimony at trial clarified that these degrees only were examples of the type of knowledge one skilled in the art would need to possess. Notably, only two of the inventors of the '497 patent (not Mr. Stevenson) possessed these degrees. Accordingly, the court concludes that these formal educational requirements do not represent part of the definition of one who would be viewed as skilled in the art with respect to the '497 patent. *See Penda Corp. v. United States,* 29 Fed.Cl. 533, 565 (Fed.Cl.1993), *appeal dismissed,* 44 F.3d 967 (1994), *cert. denied,* 514 U.S. 1110, 115 S.Ct. 1962, 131 L.Ed.2d 853 (1995).

13. The claims of Inglis provided:

1. In a method of treating industrial waste water from a lead acid battery manufacturing plant contaminated with environmentally unacceptable amounts of sulfuric acid along with lead and copper to lower the concentration thereof to levels permitting discharge of the water to a sewer, the improved steps of:

Adding an amount of an alkaline earth carbonate selected from the group consisting of calcium, magnesium and barium carbonate and mixtures thereof to the waste water to initially raise the pH thereof to a level which is especially conducive to precipitation of lead and copper carbonate and formation of an alkaline earth sulfate from the sulfuric acid;

The amount of alkaline earth carbonate added to the waste water being sufficient to raise the pH of the waste water to a level of about 4 to about 5 to effect formation of an

tion of the latter two elements would have been obvious to one of ordinary skill in the art. Plaintiffs respond that major differences exist between claim 1 and Inglis and further contend that defendant has failed to provide any evidence that one skilled in the art would have combined Inglis with other prior art to remedy these deficiencies..

The court finds that defendant has not shown, by clear and convincing evidence, that the critical elements of claim 1 of the '497 patent were all found in prior art. In particular, prior art did not envision the type of continuous flow treatment taught by the '497 patent, but instead employed versions of batch treatments. This is a major distinction. Describing the difference between a batch treatment and a continuous flow method, Mr. Dupon testified that "[a] batch treatment is differentiated from continuous flow in that water flowing into it—a specific volume of water flows into the tank. And therefore, it reacts. Once reaction is complete, water is allowed then to exit." He further indicated that in continuous flow treatment "there is a continuous input to the reaction and a continuous output," noting that ordinarily water in such a system enters the system at the same rate that it exits.

According to various testimony, prior art employing a batch approach to treating waste water required much longer treatment resonance times, relied on some degree of gradual settling and, consequently, required much larger containment vessels, often pond-like settling basins. Highlighting these distinctions between the prior art and the '497

patent, Mr. Simonetti, one of the inventors of the patent, testified:

> In the typical treatment plants we had at Kitt Energy, and they are to this day still the typical treatment plant, there are relatively large basins that are used for aeration. They are, as I say, generally designed for about 30 minutes resonance time, perhaps as much as an hour or two hours resonance time.

> By that I mean if you would take a massive volume of water coming into one of these basins, say 300 gallons per minute, and you would say 300 gallons per minute in 30 minutes would be 9,000 gallons. So you would have to have a vessel at least that size for this transfer. Typically they are much larger than that...

The Inglis patent, on which defendant primarily relies in arguing obviousness, differs from the '497 patent in essentially employing this type of batch treatment. While Inglis does anticipate that a limited flow of water may continuously enter the treatment unit, such flow is essentially a trickle and would be distinguished by one skilled in the art from the continuous flow method employed in the '497 patent.[14]

Further bringing into relief the claim at issue and prior art, Mr. Dupon candidly admitted that prior to the '497 patent, he was unaware of a tank that employed a four-minute resonance time for treating acid mine drainage. Moreover, Mr. Roth convincingly testified that:

adequate quantity of alkaline earth sulfate and precipitation of lead and copper carbonate such that upon removal of the precipitates, waste water may be discharged to the sewer which meets environmental restrictions imposed on the discharge;
A mixture of alkaline earth carbonate and alkaline earth hydroxide is added during the second addition and removing lead and copper carbonate precipitates from the waste water prior to discharging the latter to the sewer.
2. In a method of treating industrial waste water as set forth in claim 1, wherein adjusting the pH of the waste water following the addition of the alkaline earth carbonate thereto, to a level above about 7 by addition of an alkaline earth hydroxide before effecting removal of precipitates from the waste water thereby preventing the redissolution of suspended lead

and copper carbonates; and the mole ratio of carbonate to hydroxide in the second addition to the waste water is about 1 to 10.
3. In a method of treating industrial waste water as set forth in claim 1, wherein the step of adjusting the pH of the waste water to a value above about 7 with an alkaline earth hydroxide is carried out in a manner to cause the waste water to have a pH of about 8 to 9 prior to discharge of the waste water to the sewer.

14. Thus, while the '497 patent anticipated treating up to 500 gallons per minute and the Summitville site was designed and licensed to work at 100 gallons per minute, Mr. Dupon admitted, on cross-examination, that Inglis could be configured only to treat 0.833 gallons per minute.

This patent describes a significantly improved process for treating acidic waste. It invents a one-stage process to neutralize and oxidize the acidic waste simultaneously, operates with greatly reduced resonance times which greatly reduces the size of the treatment tank needed, results in precipitant which are amenable to flocculation and removal, produces an effluent which can be discharged, can be portable. He further pointed out, in reference to Inglis, that "[t]here is a batch element to it regardless of how you operate it." And he calculated that to treat the amounts of water contemplated in the '497 patent on a continuous basis using the Inglis method would require a 760,000 gallon tank, several orders of magnitude larger than the tank in the '497 patent.[15]

As the evidence unfolded, other significant differences between claim 1 of the '497 patent and the prior art became apparent. For example, Inglis relied upon resonance times that allowed for gradual settling, the recycling of water during the treatment, and the use of two different treatment tanks with separate pH adjustments—none of which features are found in claim 1. Moreover, Inglis did not teach use of an aerator in the same fashion as the '497 patent. In this regard, Mr. Dupon admitted that while the '497 patent describes agitation of the waste water by both injection of gas and an impeller, Inglis describes agitation only by gas injection.

Nor can other prior art references save this sinking ship. Striving mightily to plaster over the gaps between Inglis and the '497 patent, defendant suggests that one skilled in the art would have also relied on teachings in Inhofer and the EPA Manual. To be sure, Inhofer describes an aerator for use in the treatment of water with a propeller, thereby disclosing, in the words of claim 1 of the '497 patent, an "aerator means having agitation means." Moreover, the EPA Manual summarizes various methods for treating acid mine drainage (principally those that include iron contaminants) that rely on neutralization and oxidation, including the use of continuous flow methods using large holding basins and settling ponds. However, apart from Mr. Dupon's conclusory testimony, defendant provided no evidence explaining why one skilled in the art would have found it obvious to combine these prior art references, that is, to employ an aerator like that in Inhofer in an apparatus equivalent to that described in Inglis, or to modify Inglis based upon the teachings in the EPA Manual to derive the treatment apparatus described in claim 1 of the '497 patent.

On this count, defendant's proof certainly is not the stringent showing of a suggestion, teaching or incentive to combine features that the Federal Circuit has required to demonstrate obviousness based upon the combination of elements found in various sources. *See In re Sang Su Lee*, 277 F.3d 1338, 1343 (Fed.Cir.2002) (citing numerous cases); *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d at 1125 ("a showing of a suggestion, teaching, or motivation to combine the prior art references is an 'essential evidentiary component of an obviousness holding' "); *In re Rouffet*, 149 F.3d 1350, 1359 (Fed.Cir.1998). "This showing must be clear and particular," the Federal Circuit has stated, and "broad conclusory statements about the teaching of multiple references, standing alone, are not 'evidence.' " *Brown & Williamson Tobacco*, 229 F.3d at 1125. Of the two contrasting evidentiary standards in this quote—one describing what is required, the other what is inadequate—Mr. Dupon's views on combination more resemble the lat-

---

15. Defendant argues that it is irrelevant that Inglis' preferred embodiment is in a batch process as the continuous flow feature is not included in claim 1. However, this contention ignores that part of claim 1 which indicates that the method is designed "simultaneously" to neutralize, oxidize and agitate waste water moving at high flow rates, so as "to reduce reaction time and enhance efficiency of said reaction." As discussed in this part, the specification to the '497 patent indicates that the efficiencies referred to in the claim are produced through the implementation of what one skilled in the art would view as a continuous treatment method. By comparison, Inglis, which was not primarily designed to deal with mine waste water streams, but rather waste from a lead acid battery plant, does not anticipate rapid reactions and instead relies upon more traditional holding tanks and other means of promoting the eventual settling of contaminants out of the waste water stream.

ter. They were altogether too broad and conclusory to carry the day. His report, seemingly mirroring defendant's overall approach to proving obviousness, suffers from a hale dose of 20–20 hindsight—offering little more analysis than that because the '497 patent combined these elements others skilled in the art would have done the same. But, this is precisely the *ipse dixit* so often rejected by the Federal Circuit in the past. On one such occasion, the court cautioned that it is improper, in determining whether a person of ordinary skill would have been led to this combination of references, simply to "[use] that which the inventor taught against its teacher." *W.L. Gore,* 721 F.2d at 1553. Only by insisting upon this rigor can the court avoid entry into the "tempting but forbidden zone of hindsight," *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 873 (Fed.Cir. 1985), *overruled on other grounds by Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059 (Fed.Cir.1998). And here that rigor is lacking.

**Claim 2.** Regarding claim 2 of the '497 patent, defendant avows that the limitation added by that dependent claim—disposing the influent pipe closely adjacent to the aerator shaft discharge, whereby the "relative general proximity" of the water source, neutralizing agent feed line discharge, and agitation means enhances the "efficiency of the reaction," and automated and metering control means—is explicitly suggested by Ackman. Defendant asserts that two co-inventors of the '497 patent had actual knowledge of Ackman and that CST's prototype reactor was designed to mimic Ackman's Venturi action and "swirling agitation."

Ackman describes an "In–Line Aeration and Treatment System" (ILS), which functions in an existing acid mine drainage pipeline, as follows:

> The ILS consists of two off-the-shelf components: a jet pump ... and a static mixer ... Both components can be described as aeration and mixing devices. Jet pumps are simply nozzles that entrain air by Venturi action .... Water enters under pressure generated by the existing mine water discharge pump and is converted by the jet pump into a high-velocity stream. This stream then passes through a suction chamber, which is open to the atmosphere. If the system is being used for neutralization as well as aeration, the suction chamber also serves as the injection point for the neutralizing material ... Alternatively, the neutralizing material can be mechanically injected into the line by a metering pump anywhere before the ILS. After passing through the jet pump, the flow enters the static mixer ... The static mixer consists of 1–ft sections of pipe made of copolymer polypropylene resins, laminated together end to end with fiberglass. Inside each section is a 1–ft helix that forces the water to follow a spiral path.... Each helical unit was rotationally offset 90° from its neighbor, thereby interrupting the corkscrew every foot and enhancing the mixing action. Eight 1–ft sections were used, which provided the contact time of a normal 32–ft pipe because of the induced spiral flow.

Ackman also notes that because of problems that were experienced in the field test in injecting the neutralizer into the acid mine drainage pipeline, pilot scale tests were employed in which the jet pumps were used as an injection port—essentially simultaneously neutralizing and aerating the water.

While Ackman's teaching thus bears similarity to the new matter in claim 2, defendant seemingly turns a blind eye to the fact that claim 2 is a dependent claim, which, when combined with claim 1, has key features not found in Ackman. For example, as Mr. Simonetti pointed out, Ackman does not involve a reaction tank or automated metering and control. Moreover, claim 2 teaches the use of separate agitation means (*e.g.,* aerator prop 16 near the aerator discharge point), which is not revealed in Ackman. Thus dependent claim 2 does not appear to be obvious. At all events, the shorter response to defendant's argument regarding claim 2 derives from the Federal Circuit's repeated holding that dependent claims are nonobvious under section 103 if the independent claim on which they depend is nonobvious. *See In re Fritch,* 972 F.2d 1260, 1266 (Fed.Cir.1992); *In re Fine,* 837 F.2d 1071, 1076 (Fed.Cir.1988); *Hartness Int'l, Inc. v.*

*Simplimatic Eng'g Co.*, 819 F.2d 1100, 1108 (Fed.Cir.1987). Such is the case here. This court's conclusion that claim 1 is nonobvious thus results in a finding that dependent claim 2 is also nonobvious.

**Claims 3–9.** In its post-trial brief, defendant asserts that claim 3–9 would have been obvious in light of Inglis, Inhofer and the EPA Manual. However, defendant presented no testimony at trial in support of this claim and instead relies exclusively on Mr. Dupon's supplemental expert report received at the *Markman* hearing, without further elaboration.[16] The cited portions of Mr. Dupon's supplemental report, however, only covers claims 3 through 5, and does so not from the standpoint of obviousness, but rather anticipation. While the court is willing to extrapolate Mr. Dupon's anticipation arguments in comparing claims 3–5 to prior art, it is unwilling to extend those arguments to claims 6–9, which are not mentioned. Defendant's arguments with respect to these latter claims are deemed waived.[17]

Regarding claims 3–5 of the '497 patent, Mr. Dupon's supplemental report states:

> Assuming that the "agitation means" is not limited to a propeller, that the influent pipe means has no particular structure inside the treatment tank, that the "means for introducing" is a pump, that "generally the same point" means "in the same area of the tank," that either tank 28 or final treatment tank 50 count as means for receiving precipitants from said mixture, and

that "substantially simultaneously" means "in the same area of the tank," Inglis anticipates claims 3, 4 and 5 of the '497 patent. If the agitation means is limited to a propeller, then the aerator shown in U.S. Patent No. 4,240,990 ("Inhofer") meets the requirements of both the aerator means and the agitation means.

Of course, Mr. Dupon's observations regarding prior art are only as valid as the welter of assumptions on which they are based. And several of those assumptions wilt under scrutiny.

For example, the patent indicates that "aerator means" is distinct from the "agitation means." Accordingly, even if the agitation means were not a propeller, a structure meeting the requirements of this element of the claim would, nonetheless, have to incorporate a separate "agitation means"—and Inglis does not. Further, Mr. Dupon assumed claim 5's reference to the neutralizer and the oxidant being introduced "substantially simultaneously" is spacial, *i.e.*, in the same tank or basin. However, the dictionary reveals that the term "simultaneously" is actually temporal, and requires that the oxidant and the neutralizer be added at the same time, a feature not shared by Inglis.[18] Indeed, defendant's assertions regarding claims 3–5 are mostly a rehashing of arguments that this court has soundly rejected in the context of defendant's attack on the validity of claims 1 and 2.[19]

---

16. Plaintiffs assert that this report was not received in evidence as part of the validity trial. At the outset of the validity trial, however, the court made clear to the parties that, to avoid repetition, the record in that portion of the case would include the expert reports received at the *Markman* hearing.

17. The arguments made by defendant's post-trial brief concerning claim 6–9 are based, almost exclusively, on observations made by defendant's counsel. Without supporting testimony, the court refuses to consider such observations as being indicative of what one skilled in the art would know. *See also* discussion *infra* at part III. B.3.c.

18. The word "simultaneous" means "happening, existing or done at the same time." *See The American Heritage Dictionary of the English Language* 1623 (4th ed.2000). The court perceives

no reason not to apply the plain meaning of this term in construing this element of claim 5.

19. As noted above, defendant also asserts that claims 3–9 are invalid for lack of enablement. Defendant bases this assertion on this court's construction of two elements of claim 3—the "means for introducing a source of acidic or metal-bearing water" and the requirement that the "influent pipe means" be "disposed generally adjacent to the discharge end of said aerator shaft." However, defendant failed to produce any testimony whatsoever on this point at the validity hearing, nor did its counsel seek leave to modify this court's pretrial order of October 24, 2000, in this case, which, in listing the issues to be resolved in this stage of the proceedings, raised no enablement issues. The court, accordingly, concludes that defendant waived this assertion. This court, however, would also reject this assertion on the merits because there is

In his expert reports, Mr. Dupon also attempted to match up the critical elements of claim 3 of the '497 patents with the teachings of the EPA Manual. But, like his testimony at trial, his reports overlook the fact that the methods described in the EPA Manual lack some of the key features in claim 3 of the '497 patent. For example, while the EPA Manual teaches the use of a submerged turbine aerator, it does not address the use of an aerator that has a separate agitation means and, in fact, characterizes submerged turbine aerators as being "less efficient." More critically, while the EPA Manual discusses a process flow line that moves the waste water to a neutralization and oxidation basin, it does not teach having neutralization and oxidation occur essentially simultaneously, by having the neutralizing agent feed line be disposed generally adjacent to the end of the aerator means. Indeed, as the accompanying figure reveals, while the EPA Manual method employs a "neutralization and oxidation basin," it also employs a separate lime sludge reaction basin. And, perhaps most fundamentally, the EPA Manual teaches the use of basins in a mine water treatment process, rather than the use of a combined treatment unit. Accordingly, contrary to defendant's assertions, there is a host of significant differences between the EPA Manual and claim 3 of the '497 patent.

Figure 7-5. High-density sludge neutralization process.

**(iv) Any objective evidence of nonobviousness**

In an obviousness analysis, objective evidence of nonobviousness must be considered if present. *In re GPAC, Inc.,* 57 F.3d at 1580. Such evidence includes the commercial success of the patented invention, whether the invention meets "long felt but unsolved needs" and the failure of others to produce alternatives to the patented claims. *Graham,* 383 U.S. at 17, 86 S.Ct. 684. Objective evidence is accorded substantial weight only where the proponent establishes a nexus between such evidence and the merits of the claimed invention. *GPAC,* 57 F.3d at 1580;

*Stratoflex,* 713 F.2d at 1539; *B.E. Meyers & Co., Inc. v. United States,* 47 Fed.Cl. at 378 (Fed.Cl.2000). "A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392 (Fed.Cir.1988), *cert. denied,* 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988).

In the instant case, neither party directly addressed this factor, with what evidence

nothing about the construction of the "means for introducing a source of acidic or metal-bearing water," which precludes the "influent pipe

means" from being generally adjacent to the discharge end of the aerator shaft.

there is deriving from proof of other points. The meager testimony that was offered seemed to demonstrate that at least claim 1 of the '497 patent met a "long felt but unresolved need" by providing for a relatively compact, low-cost and efficient means for treating mine waste water. Mr. Simonetti, for example, testified that the apparatus described by the '497 patent constituted a major departure from prior apparatuses, which tended to be large immovable structures that incorporated large reaction tanks and basins.

Any other evidence in the record of commercial success and copying is weak, at best. Thus, while there was testimony that, in 1991 and 1992, CST was profitable, ultimately, it appears that plaintiffs sold or leased only about a dozen or so PIT systems and there is no information at all that would allow this court to conclude that the numbers sold or leased were a substantial quantity in the relevant market.[20] Moreover, plaintiffs provided no evidence whatsoever that the apparatus described by the '497 patent was copied by anyone. Accordingly, this court concludes that there is essentially no objective evidence of nonobviousness that bears on the validity of the '497 patent.

### 2. Redux

A latent subtext underlies all defendant's obviousness arguments—that its evidence of obviousness was so self-evident, so overwhelming, that the burden effectively shifted to plaintiffs to prove validity. But the record evidence suggests that defendant's gem does not quite sparkle with the lustre advertised. While there are some striking similarities between claim 1, Inglis and other prior art, there are just as glaring distinctions and, critically, no concrete indication that one skilled in the art would have known to combine the various features of other prior art

with Inglis to derive claims equivalent to the '497 patent. That the teachings of these various references may be cobbled together to produce an invention similar to claim 1 of the '497 is not enough, as it cannot be gainsaid that "virtually all inventions are combinations and virtually all are combinations of old elements." *Environmental Designs, Ltd. v. Union Oil Co. of California,* 713 F.2d 693, 698 (Fed.Cir.1983). Having concluded that claim 1 is not obvious, it follows, for the reasons described above, that dependent claim 2 is also not obvious. Finally, based on its review of the *Graham* factors, the court concludes that one skilled in the art would have found that claims 3–5 of the '497 patent are distinct from prior art and thus also not obvious. The meager and glancing objective evidence of obviousness/nonobviousness in the record does not impact any of the court's conclusions. Hence, the court finds that defendant has fallen far short of proving, by clear and convincing evidence, that any of the claims in the '497 patent are obvious.

### B. '800 Patent

The next stop on our journey involves the '800 patent. Defendant asserts that the claims of that patent are invalid for violating various provisions of sections 102 and 103 of the Patent Act.

### 1. Background

Reserving more extensive detail for the ensuing discussion of the party's arguments, what follows is a rapid summary of a somewhat lengthy trial record:

Prior to April 1992, CST had installed and operated a number of waste water treatment systems similar, if not identical, to the PIT System. One of these systems treated a fly-ash drainage pond at Penelec's Keystone

---

20. *See In re Huang,* 100 F.3d 135, 140 (Fed.Cir. 1996) (without evidence that the sales are a substantial quantity in the relevant market, "bare sales numbers" are a "weak showing" of commercial success, if any); *In re Baxter Travenol Labs.,* 952 F.2d 388, 392 (Fed.Cir.1991) ("[I]nformation solely on numbers of units sold is insufficient to establish commercial success."); *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir. 1983) ("The evidence of commercial success consisted solely of the number of units sold. There

was no evidence of market share, of growth in market share, of replacing earlier units sold by others or of dollar amounts, and no evidence of a nexus between sales and the merits of the invention. Under such circumstances, consideration of the totality of the evidence, including that relating to commercial success, does not require a holding that the invention would have been nonobvious at the time it was made to one skilled in the art.").

Power Generation Station (Keystone), located in Indiana, Pennsylvania. This system removed iron and manganese from the waste stream in sufficient quantities to bring the concentrations of these metals below EPA limits. Furthermore, it also removed significant amounts of aluminum from the waste stream.

On April 14, 1992, CST formally offered to sell a waste water treatment system utilizing the PIT System to Summitville Consolidated Mining Company ("Summitville"), a subsidiary of Galactic Resources, Inc., to remove copper from waste water produced at its gold mine in Summitville, Colorado. Summitville accepted this offer on April 24, 1992, and a purchase order was signed by an agent of Summitville on May 5, 1992. A PIT System was installed at the Summitville site on July 15, 1992. This system was licensed and built to treat approximately 100 gallons of water per minute and to precipitate out approximately 40 pounds of copper per day. For reasons the parties dispute, the polymer mix at the Summitville PIT System site was later readjusted by Mr. Stevenson and the site was operating satisfactorily by no later than late August, 1992. Thereafter, on May 25, 1993, the application that resulted in the award of the '800 patent was filed.

According to plaintiffs, the system needed at the Summitville site was fundamentally different than the one previously installed at the Keystone site, because the latter system was incapable of dealing with the copper-laden waste water produced at Summitville. In an effort to develop a polymer method that would deal with nonferrous pollutants such as copper, Mr. Stevenson allegedly engaged in an additional round of experimentation that was not completed until August 5, 1992. As such, plaintiffs allege that what they sold to Summitville in the spring of 1992 was an unfinished water treatment system,

lacking the specific chemical process for removing non-ferrous metals, including the specific polymers, dilution, dosage or injection points to be used to effect the removal of non-ferrous minerals. As prime evidence of this, they point to a letter from Penny McPherson, the environmental manager at the Summitville mine, to the Colorado Departments of Natural Resources and Health, dated August 31, 1992. This letter, plaintiffs claim, suggests that the specific polymer mix was not conceived until August of 1992.[21]

## 2. The On–Sale Doctrine—Ready for Patenting

■ An issued patent is invalid if "the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States, ..." 35 U.S.C. § 102(b). The sale of the invention, which case law makes clear includes an offer for sale, must be for commercial gain and not merely for experimental use. *See, e.g., D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1150 (Fed. Cir.1983). The ultimate determination whether an invention was on sale within the meaning of section 102(b) is a question of law, based on the underlying facts. *See Tec Air, Inc. v. Denso Manufacturing Michigan, Inc.,* 192 F.3d 1353, 1358 (Fed.Cir.1999); *Weatherchem Corp. v. J.L. Clark, Inc.,* 163 F.3d 1326, 1332 (Fed.Cir.1998).

■ In *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998), the Supreme Court enunciated the now-familiar standard for applying the "on sale bar," holding that twin conditions must be met: "First, the product must be the subject of a commercial offer for sale.... Second, the invention must be ready for patenting." *Id.* at 67, 119 S.Ct. 304. The Court held that to demonstrate that an invention is

---

21. Her letter reads, in pertinent part:

[The PIT System was restarted] on July 27 ... and [Summitville] directly inject[ed] the ... polymer in the stream. Only moderate success was achieved with this direct injection method and the quality of the solution in the PITS tanks was not sufficient for discharge. It was evident a near-neutral pH water source would be needed to achieve proper Allied Colloids polymer dosages to the PITS and [Summitville]

placed a pump and circulation pipeline in the clear solution (pH 7–8) near the top of the # 2 clarifier tank. The Allied Colloids polymer was not compatible with this solution.... [Summitville] asked for technical assistance in solving the flocculation and sludge formation problems at the PITS... Once ... a polymer had been found that could be used with the PITS effluent ... the PITS performed very satisfactorily.

ready for patenting a party could prove, *inter alia*, either that the invention was reduced to practice before the critical date or, "that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 67–68, 119 S.Ct. 304; *see also Vanmoor v. Wal–Mart Stores, Inc.,* 201 F.3d 1363, 1366 (Fed.Cir.2000), *cert. denied,* 531 U.S. 821, 121 S.Ct. 63, 148 L.Ed.2d 29 (2000).[22] The Supreme Court further noted that it must be "clear that no aspect of the invention was developed after the critical date," 525 U.S. at 68, n. 14, 119 S.Ct. 304, explaining that "the word 'invention' must refer to a concept that is complete, rather than merely one that is 'substantially complete.'" *Id.; see also Space Systems/Loral, Inc. v. Lockheed Martin Corp.,* 271 F.3d 1076, 1080 (Fed.Cir.2001) ("Although conception can occur before the inventor has verified that his idea will work, ... when development and verification are needed in order to prepare a patent application that complies with § 112, the invention is not yet ready for patenting.").

Applying the *Pfaff* test to the facts of this case requires defendant to establish two elements of the "on sale" defense by clear and convincing evidence, namely—(i) that there was a definite commercial sale or offer for sale of the invention claimed in the '800 patent more than one year before the plaintiffs filed their patent application; and (ii)

that at the time of that sale or offer for sale, the invention was ready for patenting. *See Linear Technology Corp. v. Micrel, Inc.,* 275 F.3d 1040, 1047 (Fed.Cir.2001). In ruling on the motion for summary judgment previously filed in this case, this court held that defendant had established the first of these prongs—that the PIT System, encompassing both an apparatus and chemical process, was on sale prior to the critical date of May 25, 1992. *Chemical Separation Technology, Inc. v. United States,* 45 Fed.Cl. 513, 517 (1999). In this regard, this court ruled that—

> in advance of the critical date, plaintiffs had made an offer to Summitville, that offer had been accepted, a purchase order had been submitted by Summitville, and Summitville had made its first lease payments to Vision Financial, a leasing agent facilitating the transaction between CST and Summitville.

*Id.*[23] In this court's view, "[t]he existence of these events is clear and convincing proof that the invention in question was subject to a commercial offer prior to the critical date." *Id.; see also Pfaff,* 525 U.S. at 67, 119 S.Ct. 304 (acceptance of purchase order makes clear that commercial offer made); *Weatherchem,* 163 F.3d at 1333 (signed purchase agreement evidence of commercial offer); *Evans Cooling Systems, Inc. v. General Motors Corp.,* 125 F.3d 1448, 1451 (Fed.Cir. 1997) (discussing similar evidence of commercial offer), *cert. denied,* 522 U.S. 1115, 118 S.Ct. 1050, 140 L.Ed.2d 113 (1998).[24]

22. *See generally,* Isabelle R. McAndrews, *"The On–Sale Bar After Pfaff v. Wells Electronics: Toward a Bright–Line Rule,"* 81 J. Pat. & Trademark Off. Soc'y 155 (1999). The Federal Circuit has repeatedly applied *Pfaff* in its recent cases, noting that the decision supplants the Federal Circuit's prior "totality of the circumstances" analysis of the "on sale doctrine." *See Space Systems/Loral, Inc.,* 271 F.3d at 1079–80 (citing additional cases); *Vanmoor,* 201 F.3d at 1366; *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.,* 182 F.3d 888, 889–90 (Fed.Cir.1999); *Weatherchem Corp.,* 163 F.3d at 1333.

23. Since this court's decision, the Federal Circuit has clarified somewhat the standard for determining whether a commercial sale or offer of sale of an invention has occurred. Thus, in *Group One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041, 1048 (Fed.Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1063, 151 L.Ed.2d 967 (2002), the court held that "[o]nly an offer which rises to the

level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration) constitutes an offer for sale under § 102(b)." *See also Linear Technology,* 275 F.3d at 1048. This court's prior finding that there was a commercial sale of the '800 patent invention prior to the critical date is consistent with these decisions.

24. Plaintiffs had attempted to counter these facts by alleging that the sale to Summitville was an experimental use. To be sure, a sale of the flocculation method for experimentation rather than profit would not constitute a commercial sale for purposes of applying the first prong of the *Pfaff* test. *See Pfaff,* 525 U.S. at 64–65, 119 S.Ct. 304; *Zacharin v. United States,* 43 Fed.Cl. 185, 192 (1999). However, as observed by this court in its summary judgment ruling:

> the Federal Circuit requires solid proof that the sale of an invention be "substantially for

It remains to determine whether, at the time of that sale or offer for sale, the invention was ready for patenting. Interpreting this standard, the Federal Circuit has held that to be "ready for patenting" the inventor must be able to prepare a patent application, that is, to provide an enabling disclosure as required by 35 U.S.C. § 112. *Space Systems/Loral,* 271 F.3d at 1080–81; *see also Robotic Vision Systems,* 249 F.3d at 1313. As such, an invention is not ready for patenting if undue experimentation is required to allow one skilled in the art to practice the invention. *See Space Systems/Loral, Inc.,* 271 F.3d at 1080–81; *see also Genentech, Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1365 (Fed.Cir.1997) ("To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'"), *cert. denied,* 522 U.S. 963, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997). This analysis must be applied to the patent on a claim-by-claim basis. In other words, the validity of each claim of a patent, even a dependent claim, is a separate consideration from the validity of any other claim, including the independent claim from which it springs. *See Lough v. Brunswick Corp.,* 86 F.3d 1113, 1122 n. 5 (Fed.Cir.1996) ("[e]ach claim of the patent must be considered individually when evaluating a public use bar."), *cert. denied,* 522 U.S. 806, 118 S.Ct. 43, 139 L.Ed.2d 11 (1997).[25] Although the burden of proving that the invention was ready for patenting lies squarely on the defendant, it is helpful to review the record evidence bearing on this prong of the inquiry through the prism of the plaintiffs' contentions.

First, plaintiffs claim that critical aspects of "polymer chemistry" in the '800 patent, such as the polymers chosen, as well as the injection concentrations, resonance times, and injection points, were not patentable until Mr. Stevenson completed his work at the Summitville site in August of 1992. They assert that while the PIT System at Keystone successfully removed iron, manganese, and aluminum from the waste stream, prior to Mr. Stevenson's August of 1992 experimentation, one skilled in the art would have been unable to employ the same method to treat a waste stream whose primary constituent was copper. To evaluate these assertions, the court must examine the differences, if any, between the claims of the '800 patent and what was reduced to practice or otherwise ready for patenting before the critical date. *See Pfaff,* 525 U.S. at 66, n. 12, 119 S.Ct. 304; *Scaltech,* 269 F.3d at 1326 (holding that the process offered for sale must inherently possess each of the claim limitations of the patented process in order to establish an on-sale violation). This inquiry, in turn, requires the court to return to the elements and claims of the patent, as construed by this court under the *Markman* process.

purposes of experiment," basing the existence of such a defense on "the objective evidence of experimentation, including the number of prototypes and duration of tests conducted, whether test records and progress reports were kept, the existence of a secrecy agreement, whether the investor received compensation for use of the invention, and the extent to which the inventor controlled the testing." 43 Fed.Cl. at 192 (quoting *Zacharin,* 43 Fed.Cl. at 192); *see also EZ Dock, Inc. v. Schafer Systems, Inc.,* 276 F.3d 1347, 1353 (Fed.Cir.2002); *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1071–74 (Fed.Cir.1992). The testimony at trial confirms this court's prior finding that the Summitville sale was not experimental. While extensive documentation regarding the Summitville sale and the Keystone lease was provided at trial, there was no evidence of experimentation records and protocols for these sites. Moreover, at least one of CST's prior owners, Thomas G. Simonetti, affirmatively testified that the Keystone contract was an "operational contract" that was for profit and did not anticipate extensive experimentation.

**25.** This result is dictated by 35 U.S.C. § 282, which provides that "[e]ach claim of a patent (whether independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim." *See also* 35 U.S.C. § 253 ("Whenever without any deceptive intention, a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid."); *Ortho Pharmaceutical Corp. v. Smith,* 959 F.2d 936, 942 (Fed.Cir.1992) (citing §§ 282 and 253 and stating "[A] party challenging the validity of a claim, absent a pretrial agreement or stipulation, must submit evidence supporting a conclusion of invalidity of each claim the challenger seeks to destroy." (quoting *Shelcore, Inc. v. Durham Indus., Inc.,* 745 F.2d 621, 625 (Fed.Cir.1984))).

At the outset, the court ascribes considerable significance to the fact that claim 1 of the '800 patent only teaches three basic things regarding the patent's polymer chemistry—that flocculating agent polymers should be used in the process, that such polymers must either be "cationic" or "anionic," and that they are to be employed to allow floccules to form to separate the metal compounds from the water. Ever so slightly expounding on this claim language, the specification merely supplies several examples of suitable polymers, stating that "NALCO 7767 is a suitable commercially available anionic polymer," and that "[c]ationic polymers may be used for dewatering purposes and may be selected from the following commercially available polymers: PERCOL AC 737 and UNIFLOC 630." Taken together, then, claim 1 and the associated portions of the specification provide virtually no detail as to the specific polymers to be used in the '800 patent, their concentration and resonant times, and reveals only a single injection point after the waste water is neutralized, aerated and agitated. Accordingly, in order to establish that claim 1 of the '800 was ready for patenting before the critical date, defendant needed only to show, albeit by clear and convincing evidence, that the pre-critical date version of the PIT System introduced a cationic or anionic polymer to form floccules at some point after the neutralization, aeration and agitation of the water.

Defendant convincingly met this burden through the testimony of none other than Mr. Stevenson, who indicated that the type of polymer being used in the PIT System on January 28, 1991, was a cationic polymer used for various flocculation purposes. He testified:

Q Which [polymer] was in use on January 28th, 1991?

A I don't remember.

Q Was it Percol–737 or Percol–730?

A It was a cationic polymer.

Q Once the polymer was added to the rotary thickener, floccules including said metal compounds formed, right?

A Yes.

Q And then inside the rotary thickener, those floccules were separated from the water, right?

A Some of them. Yes. Yes, they would have separated there. Yes.

Q And the Keystone Plant also added polymer upstream of the belt filter press, right?

A That's correct.

Q And that polymer was also a cationic polymer, is that right?

A That's correct.

Striking a similar leitmotif, Mr. Stevenson further testified on cross-examination—

Q: The CST reactor agitated the waste water, didn't it?

A: That's correct.

Q: And the CST reactor aerated the waste water, right?

A: That's correct.

Q: And the CST reactor aerated the waste water so as to oxidize the iron, right?

A: That's correct.

Q: And then you added a flocculating agent polymer in the rotary thickener, right?

A: That is correct.

This testimony, standing alone, justifies the conclusion that the polymer addition step in claim 1 of the '800 patent was ready for patenting prior to the critical date.

Yet, a wide range of documentary evidence serves to corroborate this conclusion. For example, CST's 1989 business plan described Keystone as using CST's "sludge dewatering facility," and included a drawing which showed a reactor, rotary thickener, belt filter press and a polymer unit for injecting polymer upstream of both the rotary thickener and belt filter press. Further, a Technology Review of the CST process, dated May 4, 1990, noted that the PIT System incorporated the '497 patent and added flocculent before the sludge treatment plant, which consisted of a rotary drum thickener and belt press. Finally, and perhaps most telling, the Keystone plant was described, in detail, in a report prepared by Mr. Zeising describing what he saw when he visited the Keystone

plant in late January of 1991. This report indicates that, as of that time, the Keystone plant was successfully using the process of claim 1 to remove iron and manganese (a conclusion also supported by the results of water samples taken by Mr Stevenson a week before Mr. Zeising's visit). Mr. Zeising visited the plant and observed, in operation, the reactor vessel, hydroxide formation, and flocculent addition, as well as the use of a rotary sludge thickener and belt filter press. Accordingly, focusing first on the type and basic uses of the polymers reflected in claim 1 of the '800 patent, it is apparent, through clear and convincing evidence, that what is claimed was reduced to practice at the Keystone plant in advance of the critical date.

Plaintiffs, however, rejoin that it would not have been predictable to one skilled in the art that the pre-critical-date version of the PIT System method would effectively treat a waste stream whose primary constituent was copper. Readiness for patenting then, according to plaintiffs, could not have been achieved until after Mr. Stevenson had completed his experimentation at the Summitville site because the flocculation chemistry for a non-ferrous-based waste stream was not reduced to practice prior to that time. Plaintiffs support this claim principally with the expert testimony of their expert, Dr. Roth. While defendant did not produce direct evidence showing that the PITS method could have treated a copper-laden waste stream prior to the critical date, it did produce clear and convincing evidence that copper can be removed from aqueous solution with a simple elevation in pH. Indeed, Dr. Roth admitted that removal of copper from water was well known in the art prior to 1993 and that such removal could be obtained simply by changing the pH without normally applying aera-

tion or flocculation. In addition, defendant produced clear and convincing evidence, including the testimony of Mr. Stevenson, that the PIT System at the Keystone site was, in fact, removing copper prior to the critical date, at least in trace amounts, via co-precipitation with iron. Based on this evidence, the court finds that, to the extent it was to be used to treat a copper-laden waste stream, claim 1 was ready for patenting before the critical date.

While Mr. Stevenson swore, contrariwise, that "the last piece of the puzzle" involving the '800 patent method was not in place until August of 1992, the court finds his testimony utterly incredible for several reasons. First, there is clear and convincing evidence that the Summitville PIT System was effectively removing copper from the waste stream at its start-up, and that Mr. Stevenson's experimentation was necessitated not by the need for additional development of the process' chemistry, but rather by the fact that the Summitville PITS had been damaged or altered after its initial installation. This finding is confirmed by Mr. Stevenson's prior deposition testimony, various correspondence from Mr. Stevenson predating the critical date discussing the Summitville contract, and a July 15, 1992, report on Summitville, that indicated the method was already removing copper to EPA limits.[26] Second, when pressed, Mr. Stevenson could not provide any exegetic details of the aspects of the patent that were developed during his experimentation or even what that experimentation entailed. Indeed, Mr. Stevenson's somewhat sketchy testimony strongly suggests that the experimentation he conducted was not fundamental at all, but rather the type of bench- and field-testing that typically would be con-

---

**26.** During a March 26, 1998, deposition, taken in conjunction with a separate lawsuit brought by CST against ECC, Mr. Stevenson described the follow-up trips made by CST's employees to the Summitville site, as follows:

Q: Do you recall the nature of the problem was that caused him to go out there and service the equipment?
A: Yes. They knocked it all out of spec and we had to go set it up for them again.
Q: What do you mean "all out of spec"?
A: They were experimenting with it, I believe, and the pH's weren't proper, the pump

speeds weren't proper. They couldn't get the polymers to work.
Q: What did Mr. Knight do to get it back into sync, so to speak?
A: Cleaned check valves, cleaned up the polymer-dosing system, and recalibrated the unit.

Notably, in this deposition testimony, Mr. Stevenson does not mention that he or any other CST representative returned to Summitville to work on the polymer chemistry, so as to allow the method to work on copper.

ducted by one skilled in the art to adjust the pH level and polymer usage to optimize the treatment of a particular waste stream. There is no indication that this experimentation was anything other than the sort of fine tuning that plaintiffs, in the *Markman* hearing, successfully argued did not render claims indefinite. Finally, were this experimentation ground-breaking in its treatment of a waste stream that included copper—and there is clear and convincing evidence in the record that it was not—it remains that nothing of this ground-breaking chemistry is reflected in claim 1 of the patent or, for that matter, any of the other claims therein.

As such, this court finds that the government succeeded in establishing, via clear and convincing evidence, that the method of claim 1 of the '800 patent was ready for patenting at the time the PIT System was sold to Summitville, despite the fact that it previously had not been used to treat copper-predominated waste streams. Because, as this court previously determined, the invention that is described by claim 1 was also the subject of a sale prior to the critical date, claim 1 is hereby held invalid under section 102(b). That leaves claims 2 through 25 in the '800 patent. These dependent claims modified the method in claim 1 in various fashions, some describing different introduction points and uses for a polymer, several referring to the use of a polishing pond, and a number positing various steps dependent upon the addition of a clarifier to the process.[27]

The foregoing evidence demonstrates conclusively that a number of these dependent claims were also "ready for patenting" before

27. These claims provide:

2. The method of claim 1 wherein there is added the further step (f) of further dewatering the floccules separated in step (e).

3. The method of claim 2 wherein additional flocculating agent polymer is added to at least a portion of the waste water containing the flocculated metal compound separated in step e.

4. The method of claim 3 wherein after the addition of the additional flocculating agent polymer, the flocculated metal compound is dewatered in step (f) in a belt filter press.

5. The method of claim 4 wherein there is water which is removed in step (f) and said water removed in step (f) is removed to a polishing pond.

6. The method of claim 2 wherein in step (e) separation is conducted by means of a clarifier.

7. The method of claim 6 wherein additional flocculating agent is added to at least a portion of the flocculated metal compound separated in step (e).

8. The method of claim 7 wherein after the addition of the additional flocculating agent polymer, the flocculated metal compound is dewatered in step (f) in a belt filter press.

9. The method of claim 8 wherein there is water removed in step (f) and said water removed in step (f) is removed to a polishing means.

10. The method of claim 2 wherein in step (e) separation is conducted by means of sequential treatment in a clarifier and a rotary drum thickener.

11. The method of claim 10 wherein additional flocculating agent polymer is added after the clarifier and then again after the rotary drum thickener.

12. The method of claim 11 wherein after the additional flocculating agent polymer, the flocculated metal compound is dewatered in step (f) in a belt filter press.

13. The method of claim 12 wherein there is water removed in step (f) and said water removed in step (f) is removed to a polishing pond.

14. The method of claim 11 wherein water removed in step (f) is removed to a settling pond.

15. The method of claim 2 wherein step (e) separation is conducted by means of a settling pond.

16. The method of claim 15 wherein additional flocculating agent is added after the settling pond.

17. The method of claim 16 wherein after the additional polymer is added the flocculated metal compound is dewatered in step (f) in a belt filter press.

18. The method of claim 1 wherein in step (a) the pH is adjusted to from about 6 to about 9.

19. The method of claim 1 wherein in step (a) the pH is adjusted by adding a neutralizing agent selected from sodium hydroxide, anhydrous ammonia, sulfuric acid and hydrochloric acid.

20. The method of claim 1 wherein the polymer is a cationic polymer which is used for dewatering purposes.

21. The method of claim 1 wherein the polymer is an anionic polymer which is used for primary clarification purposes.

22. The method of claim 1 wherein the polymer is a anionic polymer which is used for settling purposes.

23. The method of claim 1 wherein the polymer is added in a dilute concentration of from about 0.5% to about 1.5% by weight.

24. The method of claim 1 wherein after step (e) a portion of the separated water is removed to a polishing pond.

25. The method of claim 1 wherein in step (e) separation is conducted by means of a rotary drum thickener.

the critical date. Specifically, based on the evidence produced regarding Keystone, the court finds that dependent claims 2, 3, 4, 20, 21 and 25, which relate to the use of cationic and anionic polymers in dewatering, including the use of a belt filter press, were reduced to practice and ready for patenting. In addition, record evidence indicates that claims 18, 19 and 23 were also ready for patenting, as the method reduced to practice at Keystone included steps whereby the waste water was neutralized to a pH between 6 and 9 using sodium hydroxide, and whereby a polymer with a dilute concentration of from about 0.5 percent to about 1.5 percent (actually 1 percent) was employed. Finally, as there is clear and convincing evidence that Keystone also employed a polishing pond, claims 5 and 24 of the '800 patent were also reduced to practice prior to the critical date. Summarizing then, the evidence that demonstrates that claim 1 was "on sale" prior to the critical date, also demonstrates, to the same degree, that claims 2–5, 18–21 and 23–25 were "on sale" and thus are invalid.

Defendant also asserts that claims 6, 7 and 10 were ready for patenting prior to the critical date. It admits that these claims were not practiced at Keystone, as that plant made no use of a clarifier and first stage separation occurred only in a rotary thickener. Nonetheless, defendant provided clear and convincing evidence that the use of a clarifier, as part of the overall process and, specifically, in conjunction with a rotary thickener, was conceived prior to the critical date. In particular, CST's 1991 business plan contains a figure that depicts the use of a clarifier in conjunction with the PIT System then in use at the Keystone plant. *See Scaltech,* 269 F.3d at 1331 (holding that invention was ready for patenting because "the inventor had prepared drawings or a description sufficient for enablement"). That this drawing was an enabling description that would have allowed one skilled in the art to practice claims 6, 7 and 10 of the '800 patent without undue experimentation is confirmed by the fact that Mr. Stevenson offered these features to Summitville and was able to start up the PIT System with these features already intact in July of 1992—prior to the time that he allegedly conducted the experi-

mentation that led to the "refinement" of the method. Moreover, it bears repeating that the record discloses that Mr. Stevenson was required to conduct that further experimentation not because of the need to develop these features in the patent, but because the PIT System was damaged or modified subsequent to its installation, causing it to malfunction. Accordingly, the court finds, based upon clear and convincing evidence, that claims 6, 7 and 10 were also "on sale" prior to the critical date and thus are invalid.

In a last ditch effort to salvage both claim 1 and the succeeding dependent claims from the "on sale bar," plaintiffs argue that, the Summitville site was experimental in nature—making this assertion not to contest this court's earlier conclusion that the sale to Summitville was commercial, but rather as circumstantial evidence that the various claims of the '800 patent were not ready for patenting. Of course, a direct response to this assertion is that the facts show that these claims were reduced to practice. *See Zacharin v. United States,* 213 F.3d at 1369; *RCA Corp. v. Data Gen. Corp.,* 887 F.2d 1056, 1061 (Fed.Cir.1989). That aside, the nature of the Summitville contract, and the negotiations that led thereto, only serve to confirm this court's conclusion that many of the claims of the '800 patent were ready for patenting.

The first evidence of this may be found in the communications leading up to the sale. For example, in a letter he wrote to Summitville on April 3, 1991, Mr. John LeFever, a project manager for CST, represented that "[b]ased on the water quality data provided, we are confident that we can remove the contained metals to acceptable standards for discharge." He indicated further that "[i]n the case of Summitville leachate solution, selective precipitation of copper and zinc as sulfides and sulfates can be achieved at a pH level of 5." Subsequently, on April 14, 1992, Mr. Stevenson wrote Summitville to describe the "design criteria" for the project, among them, that the influent waste water, at worst, would contain 190 mg./l. of copper. This letter also described in detail the equipment that CST would provide for the "budget price" of $280,000. Two days later, on April

16, 1992, Mr. Stevenson wrote Summitville, stating that the "effluent discharge quality" at the site should be less than 1 ppm for iron, manganese, and zinc, and, significantly for our purposes, less than 0.1 ppm for copper. In this letter, Mr. Stevenson further represented that "[h]istorically we have experienced metal discharge ranges in the .002 mg/l (ppm) ranges and those limits could be achievable at the ADIT site." Nothing in these communications suggests the slightest doubt that the PIT System could remove copper from the waste water streams at Summitville.

Then, on May 15, 1992, Mr. Stevenson wrote Summitville two letters: the first describes in great detail the operational sequence of CST's treatment method and trumpets that "CST units are adaptable to alternate energy, oxidation and chemical inputs to treat and dewater most waste water discharges of acidic or alkaline." The second discusses the recovery of mercury, lead and cadmium from the Summitville site, indicating that "the above metals will experience some co-precipitation with Fe and Cu." The information contained in these letters was used by Summitville to prepare an "Interim Measure Report," dated May 15, 1992, for the Colorado Departments of Natural Resources and Health. The report apparently was key to the potential settlement of pending environmental claims filed by the state agencies against Summitville. It described in great detail the PIT System, with accompanying flow charts, and indicated that "[t]he process to be utilized in the treatment of flow from the property for reduction of copper and other metals ... is a caustic soda (NaOH) precipitation process." The report restates the effluent concentration for copper and other elements supplied by CST and summarizes various assurances made by CST to Summitville, among them that the PITS "has been designed to remove a minimum of 44 pounds of copper per day for the entire year and to achieve higher copper loadings removal (i.e., an average 102 lb/day) for a significant portion of the operating season." Again, there is no hint in this report of any doubt that the PIT System could remove copper—a fact that undoubtedly would have been relevant to the Colorado agencies—and, indeed, absolutely no indication in any of the CST correspondence that modification of the PITS to remove copper was still in an experimental stage.

To cinch matters, plaintiffs' claims regarding the Summitville site are also belied by the terms of the contract executed with respect to that site. First of all, it is telling that Summitville agreed to purchase outright from CST, through a sale/leaseback arrangement with a third party, the equipment necessary to treat its waste stream at a total price of $288,400. Nothing in the purchase or sale/leaseback agreements conditions the sale upon CST's ability to actually be able to treat a copper-laden waste stream. This is further evidence that Summitville believed that it was purchasing what CST had unqualifiedly advertised—a completed process for treating its copper-laden waste water. Consistent with this view, there is not a shred of evidence in the record of any systematic testing of the system, the maintenance of records of such experimentation or other indications that CST maintained control over the reactor and its testing. *See Lough v. Brunswick Corp.,* 103 F.3d 1517, 1521 (Fed. Cir.1997); *Seal–Flex, Inc. v. Athletic Track & Court Constr.,* 98 F.3d 1318, 1323 (Fed.Cir. 1996). Indeed, in an August 31, 1992, report to the Colorado state agencies described above, Summitville describes various problems that had occurred at its PITS site since July 15, 1992, attributing the delays not to any experimentation by CST, but to two other phenomena: (i) a lightening strike near the PIT System which overloaded the system's computer board and damaged the pH control probe; and (ii) the need to conduct polymer field testing. Regarding the second problem, the report indicates that the polymer field testing was conducted not by CST, but by a representative of Western Water Management, a polymer distributor. It notes that the polymer selected by Western "worked very well with the PITS effluent, providing excellent flocculation and sludge cake formation." This report concludes that "[o]nce the computer board had been replaced, the start-up problems had been ironed out and a polymer had been found that could be used with the PITS effluent as the

make-up water, the PITS performed very satisfactorily." [28] And it bears repeating that even before this field testing, the PIT System was removing copper—thereby already reducing to practice the step that plaintiffs assert required additional testing before being ready for patenting.

In sum, the court finds that the PITS method sold to Summitville inherently possessed each of the limitations of claim 1 of the '800 patent. While the court accepts that the method may have undergone some experimentation and refinement after the critical date, in the court's opinion, such experimentation, at most, constituted "fine tuning" of features not claimed in the patent. Similarly, the court concludes that the following dependent claims were also reduced to practice or otherwise ready for patenting prior to the critical date: claims 2–7, 10, 18–21, and 23–25. Together with claim 1, these dependent claims were both the subject of a commercial sale and ready for patenting in advance of the critical date and, therefore, under section 102(b), are invalid. As to these claims, the presumption of legitimacy has been overpowered, and the burden of showing them to be nugatory has been shouldered.

### 3. Defendant's Remaining Objections to the Validity of the '800 Patent

Defendant argues that the various claims in the '800 patent are invalid for other reasons. Thus, it contends no claim of the '800 patent is enabled, that various claims in the patent were anticipated by prior art and that every claim in the patent is obvious. The court will deal with each of these sets of arguments in turn.

### a. Enablement

■ This next leg of our journey requires the court to consider whether various claims in the '800 patent were enabled. Under section 112, paragraph 1, of the Patent Act, patents must describe "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same." 35 U.S.C. § 112, ¶ 1 (1994). This provision requires the patent to disclose enough information so that one skilled in the art may make and use the full scope of the claimed invention without undue experimentation. *Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350, 1358 (Fed.Cir.1999), *cert. denied*, 529 U.S. 1037, 120 S.Ct. 1531, 146 L.Ed.2d 346 (2000). One of the grounds for finding nonenablement arises when a claimed method reads on nonoperative as well as operative embodiments—as defendant describes in its brief, "a genus is claimed, but only a species is enabled." This scenario is particularly encountered in patents concerning chemical reactions and biological activity. For example, in *In re Goodman*, 11 F.3d 1046 (Fed.Cir.1993), the claim covered a method for producing "mammalian peptides in plant cells," but was enabled only with respect to the production of peptides in "dicotyledonous plant cells," not all plant cells. *Id.* at 1050–52.[29] As with its other validity arguments, defendant must demonstrate the facts underlying its enablement assertions by clear and convincing evidence. *Union Pacific Resources Co. v. Chesapeake Energy Co.*, 236 F.3d 684, 692 (Fed.Cir.2001); *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed.Cir.1985).

**28.** As noted in the introductory factual summary for this section, plaintiffs rely on a letter sent by Penny McPherson, the environmental manager at the Summitville mine, to various Colorado agencies, describing problems encountered at the site. Plaintiffs assert that this letter shows that the problems identified were fundamental and only solved through Mr. Stevenson's extraordinary efforts. When placed in the context of the entire record, however, Ms. McPherson's letter appears merely to recount the same basic story told by the August 31 report to the Colorado agencies and the other documents in the record. Accordingly, in the court's view, this letter does not support plaintiffs' claims regarding the alleged experimental nature of the Summitville site.

**29.** *See also Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1377 (Fed.Cir.1999) ("antisense technology" claim enabled only with respect to some "prokaryotes," but claimed for "eukaryotes" as well, held nonenabled); *In re Vaeck*, 947 F.2d 488, 496 (Fed.Cir.1991) (claim for genetic transformation of "cyanobacteria" held nonenabled where written description enabled invention for only one species of cyanobacteria, not all species).

Defendant asserts that the cardinal flaw in the '800 patent—one which invalidates all 25 claims—is that the patent claims to cover the removal of eight metals, either alone or in combination, from waste water, but is enabled only as to some of those combinations. Central to this argument is the allegation that arsenic or hexavalent chromium [30] alone in solution, or together with no other materials present, will not precipitate if only the steps of claim 1 are performed. Defendant further asserts that the process of oxidation, as outlined in claim 1, cannot be accomplished if only certain metals are present in the waste stream. Finally, it contends that nothing in claims 2–25 remedies these problems, as those steps pertain to separation and have nothing to do with pH adjustment, oxidation or flocculation.

To a certain extent, and not surprisingly, there is tension between defendant, on the one hand, arguing that various of the claims in the patent were on sale, and, as such, *ready for patenting*, and, on the other, arguing that some of the same claims were not enabled. Either the claims are enabled or they are not. Plaintiffs' arguments, however, are not immune from these same "tensions"—thus, for example, while they vigorously argue that various claims in the '800 patent were not indefinite because one skilled in the art would know that various *forms of bench and field testing would be* required to make the process work on a particular waste stream, they deftly seek to recharacterize similar sorts of bench and field testing as being more fundamental in arguing that various claims were not ready for patenting. Certainly, consistent with modern forms of pleading, it is open to the parties to argue alternative theories—but *there is only a single set of findings appropri-*

ate in this case, findings that are driven, in no small part, by the heavy evidentiary burden borne by defendant in seeking invalidation, *to wit*, the ever-present clear and convincing evidence standard. And regarding the issue at hand, this court finds that defendant has not shown, by clear and convincing evidence, that the claims in the '800 patent were not enabled.

To be sure, defendant's expert, Mr. Dupon, testified in great detail regarding the behavior of arsenic alone in waste water stream. He seemed to suggest, at one point, that no adjustment in the pH or oxidation of such a waste water stream would cause arsenic to precipitate and that it could be removed from the waste stream only if a coagulant were added to the water, such as iron or manganese. Mr. Dupon went on to make similar observations regarding the hexavalent form of chromium. Less than clear is what assumptions he made in rendering these opinions and, in particular, whether his opinion was tainted by those of his constructions of the patent which the court, in its *Markman* ruling, rejected. There are several indications that such a taint occurred. For example, in his testimony, Mr. Dupon seemed to persist in the notion that ozone and chlorine would not be used as oxidants, despite the fact that the patent had been construed to include potentially the use of such oxidants. Indeed, under cross-examination, he admitted that ozone could be used to oxidize arsenic, eventually leading to its co-precipitation. Similarly, Mr. Dupon seemed to assume that more unusual and perhaps expensive forms of neutralizers, for example, magnesium hydroxide and barium hydroxide, would not be employed, despite there being no limitation in the patent to exclude such neutralizers.[31]

---

30. An ion, by definition, exhibits a charge, positive or negative. The degree of that charge depends on the disparity, in that ion, between the number of electrons, which carry a negative charge, to the number of protons, which carry a positive charge. In the case of chromium, two ionic valence states predominate—trivalent chromium, which is "missing" three electrons, displays a charge of $+3$, while hexavalent chromium, which is "missing" six electrons, displays a charge of $+6$.

31. While, at one point in his testimony, Mr. Dupon suggested that one skilled in the art would not consider the use of barium hydroxide, at another point, he indicated only that one skilled in the art would consider the use of calcium hydroxide, sodium hydroxide and potassium hydroxide before considering the use of barium hydroxide. In the court's view, this does not constitute clear and convincing evidence that one skilled in the art would not anticipate the use of barium hydroxide to precipitate chromium as part of the process. The court's finding in this regarding is also supported by Dr. Roth, who

His testimony, at points, suggests that with less common oxidants and neutralizers, arsenic and hexavalent chromium could be precipitated using the method of the '800 patent. Further, on several occasions, Mr. Dupon's testimony seems to assume that the method described in claim 1 would have to occur using a pH adjustment precisely between 5 and 12, notwithstanding this court's ruling that the use of the term "about" in this element of claim 1 provides for some flexibility in assessing the specific pH that would optimize precipitation.

More critically, Mr. Dupon testified that he was unsure whether he had ever encountered hexavalent chromium in a mine waste water stream and he further testified that, in his experience, acid mine waste waters would usually have multiple metal contaminants in fluctuating concentrations, thereby leaving the distinct impression that one would not find in nature a mine waste stream contaminated solely by arsenic and/or hexavalent chromium. This point is significant, as it is well established that a claim will not be invalid as nonenabled if it reads on subject matter that is inoperative "only on the basis of unreasonable assumptions or without limitations that would be implied by one with ordinary skill in the art." 3 Donald S. Chisum, *Chisum on Patents*, § 7.03[7] at 7–123 (2001). The fact then that claim 1 of the patent might not work with respect to an acid mine stream that is exceedingly rarely, if ever, encountered in nature thus does not provide a predicate for concluding that the claim is nonenabled. As the Federal Circuit noted in *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569 (Fed.Cir. 1984): "Even if some of the claimed combinations were inoperative, the claims are not necessarily invalid.... [I]f the number of inoperative combinations becomes significant, and in effect forces one of ordinary skill in the art to experiment unduly in order to practice the claimed invention, the claims might indeed be invalid." *Id.* at 1576–77. Here, like the Carrollian Jabberwock, the nonenabling examples cited by defendant's expert are more fiction than reality—to borrow defendant's phrase, such waste streams

are nonexistent "species" of the "genus" treated by the patent. As such, they provide no basis for invalidating claim 1 of the patent. *See Ex parte Breuer*, 1 U.S.P.Q.2d 1906, 1906 (Bd. Pat.App. & Int'f 1986) ("The issue is not whether the examiner can conjure up a substituent group ... which does not exist. A person having ordinary skill in the art would readily appreciate that compounds containing such substituent groups do not exist.")

Defendant's argument that dependent claims 2 through 25 of the patent were not enabled is contingent on its assertion that claim 1 was not enabled. As this court rejects the latter assertion, it follows that defendant's enablement arguments concerning the remaining claims of the '800 patent must also fail.

### b. Anticipation

■■■ Continuing this odyssey, the court next considers whether the '800 patent was anticipated. Section 102(a) provides that "[a] person shall be entitled to a patent unless— (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." Based on this section, it is well settled that a claim is anticipated, and thus invalid, if each and every limitation is found either expressly or inherently in a single prior art reference. *See Celeritas Technologies, Ltd. v. Rockwell International Corp.*, 150 F.3d 1354, 1361 (Fed.Cir.1998), *cert. denied*, 525 U.S. 1106, 119 S.Ct. 874, 142 L.Ed.2d 774 (1999); *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 715 (Fed.Cir.1984). "To establish inherency," the Federal Circuit recently stated, "the extrinsic evidence 'must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill.'" *In re Robertson*, 169 F.3d 743, 745 (Fed.Cir.1999); *see also Continental Can Co. U.S.A., Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed.Cir.1991). Such inherency may not be established by "'probabilities or possibilities.'" *Continen-*

testified that one skilled in the art would know to use barium hydroxide to precipitate chromium.

*tal Can,* 948 F.2d at 1269 (quoting *In re Oelrich,* 666 F.2d 578, 581 (C.C.P.A.1981)). Summing up these standards, the Federal Circuit has instructed that "if granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art." *Atlas Powder Co. v. Ireco, Inc.,* 190 F.3d 1342, 1346 (Fed.Cir.1999).

Although this court has already concluded that claim 1 of the '800 of the patent is invalid under the on-sale doctrine, it, nonetheless, will consider defendant's assertion that this claim is also anticipated because if it is not, then none of the other dependent claims in the patent (including those that are not invalid under the on-sale doctrine) are anticipated. *See RCA Corp. v. Applied Digital Data Sys., Inc.,* 730 F.2d 1440, 1446 (Fed. Cir.1984), *cert. dismissed,* 468 U.S. 1228, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984). Relying on claim charts in Mr. Dupon's expert reports, defendant charges that each of the elements in claim 1 of the '800 patent are found literally in the EPA Manual and Inglis. But, both Mr. Dupon's original expert report and his supplemental report caution that his conclusion that the EPA Manual and Inglis anticipate the claims of the '800 patent "depends on the interpretation of the claim language." Defendant avers that this caveat is irrelevant because, at trial, Mr. Dupon testified that this court's constructions of the patent had not changed his mind regarding whether the patent was anticipated. Defendant criticizes Dr. Roth's contrary's opinion, asserting, in part, that it was "wholly conclusory" and "in sharp contract to Mr. Dupon's thorough analysis." This court, however, adjudges Mr. Dupon's claim-chart analysis significantly less than "thorough" and entirely inadequate to meet defendant's burden of proving anticipation by clear and convincing evidence.

Particularly this is so, as careful review of the references cited by Mr. Dupon, as well as Dr. Roth's testimony, betrays clear differ-ences between claim 1 of the '800 patent and what is taught in the EPA Manual and Inglis. For example, while claim 1 discloses that the adjustment of the pH of the waste water, and the aeration and agitation thereof, should be "carried out simultaneously in a reaction tank," the EPA Manual teaches only that oxidation and neutralization should occur gradually in the same basin. Further, as Dr. Roth indicated in his expert report, the method for accomplishing the neutralization of the waste water in the method described in the EPA Manual relies on the introduction of a lime slurry and recycled sludge into the neutralization and oxidation basin—steps not found in claim 1 and, in the absence of which, the EPA Manual indicates that its method will not work.[32] As to Inglis, Mr. Dupon's claim-chart is even more desultory, failing, for example, to supply a citation as to how Inglis, which describes a method for treating waste water from a lead acid battery manufacturing plant, "simultaneously" accomplishes the neutralization, aeration and agitation of the waste water. Moreover, Mr. Dupon failed to account for, either in his chart or his testimony, the possible differences in the pH levels relied upon by the two processes. Thus, while claim 1 of the '800 patent indicates that the pH level of the waste water should be adjusted to "from about 5 to about 12," the specification in Inglis appears to suggest that any pH adjustment in that process should cease when the pH of the waste water reaches "about 5." Without further elucidation, it is impossible for this court to determine what overlap one skilled in the art would perceive between these two steps, particularly since Mr. Dupon's expert reports took the view that the phrase "about 5," as used in the '800 patent, was indefinite—a position ultimately rejected by this court.

■ Given that Mr. Dupon explicitly conditioned his findings of anticipation upon interpretations of the '800 patent that were subsequently rejected, the court believes that

---

**32.** Thus, the EPA Manual indicates that "[t]he [high-density sludge] process operates successfully only when the lime slurry and recycle sludge are mixed in a reaction tank prior to the addition of acid mine drainage and aeration. This repre-sents the most critical step in the process. Any other process arrangement results in the failure of the process to achieve the desired solids concentration."

his conclusory reaffirmation of his prior findings,[33] without any explanation whatsoever of the impact of this court's *Markman* rulings, represents far too slim a reed upon which to declare the patent at issue is invalid. *See The Upjohn Co. v. Mova Pharmaceutical Corp.*, 225 F.3d 1306, 1311 (Fed.Cir.2000) ("there must be factual support for an expert's conclusory opinion"); *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1572 (Fed.Cir.1984) (refusing to credit "an unsupported conclusory opinion which ignored, rather than conflicted with, the evidence of record."). More fundamentally, while Mr. Dupon cites evidence that individual elements for treating acid mine water waste are scattered in the EPA Manual and Inglis, there is no indication that either of these sources combined the steps in any fashion remotely similar to claim 1. To be sure, anticipation is analyzed on a claim-by-claim basis. But, one seeking to invalidate a patent may not demonstrate invalidity of a claim simply by citing isolated steps in prior art that are not combined in the same fashion as the patent. To the contrary, the Federal Circuit has repeatedly made clear that "[t]o anticipate, every element and limitation of the claimed invention must be found in a single prior art reference, arranged as in the claim." *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed.Cir.2001); *see also Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed.Cir.2001); *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.Cir.1991).[34] Critically, such proof of combination in a single source, arranged as described in the claim, is deficient here.

Accordingly, the court concludes that claim 1 of the '800 patent was neither anticipated by the EPA Manual nor Inglis. None of the dependent claims in the patent, and, particularly, none of the claims that remain valid after this court's application of the on-sale bar, were anticipated by those two references either. Based on this court's resolution of the on-sale issue, this court need not reach defendant's remaining anticipation arguments, which either concern claims of the patent that have already been invalidated or do not reach claims unaffected by the on-sale bar.

### c. Obviousness

At the last port of call, this court must determine whether various claims of the '800 patent would have been obvious. To address this assertion, the court must consider anew the *Graham* factors.

The evidence with respect to three of those factors is readily summarized. Defendant asserts that the relevant prior art includes the '497 patent, the EPA Manual, Inglis, the Keystone plant, U.S. Patent No. 4,834,878 (Anderson), the Nalco Water Handbook (1988), U.S. Patent No. 4,705,640 (Whittaker), U.S. Patent No. 5,213,693 (McGrow et al.), *Sludge Treatment,* (Eckenfelder and Santhanam eds., 1981), and Guy R. Mace, *Specifier's Guide to Polymer Feed Systems,* XXII–5 Pollution Engineering 75 (1990). Plaintiff has stipulated that some of these references are analogous prior art and does not seriously contest the characterization of the rest, and, as such, the court finds that the

**33.** Mr. Dupon's entire testimony, concerning whether the claims of the '800 patent were anticipated and obvious, was as follows:

> Q: Mr. Dupon, you gave opinions in your written expert report regarding whether or not the claims of the 800 patent were ready for patenting, anticipated and obvious.
> A: Yes, I do.
> Q: Interpreting the term—let me give you some assumptions. Assuming that the term, "removing," means to take away or eliminate, assuming that the adjustment of pH step means bring the pH to a point that optimizes precipitation—bring the pH to a point within the range specified that

> optimizes precipitation of metals, said point to be determined by reasonable experimentation, that aerating means supplying air and other gaseous oxidants to the waste water, and that aerated in said reaction tank means aerated to adequately complete the process of oxidation, on that assumption—on those assumptions, has your opinion regarding the 800 patent and whether it was ready for patenting, anticipated and obvious, changed?
> A: No, I do not believe it has.

**34.** Moreover, that court has applied this rule even where, as here, the patent in question employed the inclusive transitional phrase "comprising." *See C.R. Bard, Inc.*, 157 F.3d at 1349.

references listed are analogous prior art.[35] For the reasons, and based upon the evidence, summarized above, this court also concludes a person of ordinary skill in the art with respect to the '800 patent would have essentially the same knowledge as one so skilled with respect to the '497 patent. Finally, as was the case with respect to the '497 patent, there is no real objective evidence that sheds any light on the obviousness issue here. Not surprisingly, then, defendant's obviousness allegations rise or fall on a comparison between the '800 patent and prior art.

Turning first to claim 1 of the '800 patent and referring to its expert's reports, defendant asserts on brief that "Mr. Dupon's obviousness analyses of the EPA Manual . . ., the Inglis and Anderson patents . . ., and the Nalco Water Handbook . . . are sufficiently detailed that they need not be repeated here." Examination of the paragraphs of the reports cited by defendant, however, reveals that several of them do not discuss obviousness at all, but rather anticipation, and refer only to a single prior art reference—the EPA Manual. In rejecting this anticipation argument above, this court perceived significant differences between the EPA Manual and claim 1 of the '800 patent. Defendant's obviousness arguments based upon the same reference fare no better. What is determinative here, however, is defendant's failure to demonstrate any suggestion or motivation to modify the concepts in the EPA Manual to conform to the elements of claim 1. Thus, in *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339 (Fed.Cir.2001), the Federal Circuit stated, in language that resoundingly resonates here:

In cases such as this where a single prior art reference is alleged to render the claimed invention obvious, there must be a sufficient showing of a suggestion or motivation for any modification of the teaching of that reference necessary to reach the claimed invention in order to support the obviousness conclusion.... This suggestion or motivation may be derived from the prior art reference itself, from the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved.

*Id.* at 1359; *see also SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356 (Fed.Cir.2000); *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 72 F.3d 1577, 1582 (Fed.Cir.1996). Defendant has failed to provide any evidence on the motivation or suggestion that would have led one skilled in the art to modify the teachings of the EPA Manual to derive claim 1 of the '800 patent. Instead, defendant seemingly suggests that claim 1 is obvious based upon the EPA Manual for the same reason that it is anticipated—and, predictably, for the same reasons cited above, the court hereby rejects that obviousness assertion, as well.[36]

This court, however, reaches a different conclusion regarding defendant's obviousness arguments based upon the Keystone plant. By definition, all the claims rendered invalid under the on-sale doctrine based on Keystone, which illustrated that those claims were ready for patenting, are also invalid as obvious based upon treating Keystone as prior art. *See Pfaff*, 124 F.3d at 1436. (finding claims obvious based upon what was sold before the critical date); *Baker Oil Tools,*

35. As indicated, the list of prior art includes the '497 patent and Keystone. Because the on sale bar applies if "the subject matter of the sale or offer to sell ... would have rendered the claimed invention obvious by its addition to the prior art," *Pfaff v. Wells Elecs.*, 124 F.3d 1429, 1436 (Fed.Cir.1997) (quoting *UMC Elecs. Co. v. United States*, 816 F.2d 647, 657 (Fed.Cir.1987)), *rev'd on other grounds*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998), what was offered for sale before the critical date becomes, in effect, "a [prior art] reference under section 103 against the claimed invention." *Id.* at 1436 (quoting *Baker Oil Tools v. Geo Vann, Inc.*, 828 F.2d 1558, 1563 (Fed.Cir.1987)); *see Harmon* at p. 156 ("An inventor's own publication is of course prior art under § 103 if early enough. Thus, where an inventor publishes more than a year before filing, he or she forecloses obtaining a patent on an invention that would have been obvious from the publication, with or without disclosure of other prior art.").

36. The same analysis applies to the paragraphs in Mr. Dupon's report asserting that claim 1 of the '800 patent is obvious based solely upon Inglis. Thus, in the absence of any proof that one skilled in the art would have modified Inglis to derive claim 1, the court rejects this assertion for the same reasons it rejected defendant's anticipation argument based on the same reference.

828 F.2d at 1563. Keystone not only suggests but embodies the teachings in the following claims: 1–5, 18–21 and 23–25. Accordingly, the court finds that all these claims are obvious.

But what of the claims that are not embodied by Keystone? Defendant maintains that these claims are obvious based upon two amalgams: (i) combining all the cited prior art references except for Keystone and Inglis; and (ii) combining the '497 patent with the EPA Manual, Anderson, and Keystone. Remarkably, both arguments proceed without the benefit of any real testimony on what one skilled in the art would have known, and instead, rely exclusively on counsel's assertions regarding these prior art references and, assertedly, the plain language of the references themselves. That one skilled in the art would have combined these references to derive claims such as 8–9, 11–17 or 22 of the '800 patent, however, is far from apparent and certainly cannot be divined from a simple reading of the references, which do not explicitly discuss such combinations. The arguments made by defendant's counsel on brief, which, in some instances, consist little more of string citations to the prior art, do not supply the necessary missing evidentiary link, *to wit*, clear and convincing evidence that "the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in light of the prior art." *Brown and Williamson Tobacco Corp.*, 229 F.3d at 1124 (quoting *In re Dow Chem.*, 837 F.2d 469, 473 (Fed.Cir.1988)). Mere attorney argument is no substitute for concrete evidence of what one skilled in the art would have perceived—defendant's counsel was neither qualified as an expert nor did he testify at trial, and this court will not permit him essentially to testify in his brief. *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed.Cir.1989) (attorney argument is no substitute for evidence); *In re Budge Mfg. Co.*, 857 F.2d 773, 776 (Fed.Cir.1988) (statements of attorney are "no evidence"). Indeed, defendant's counsel's *causa patet* assertions that prior art evidences numerous suggestions to combine the '497 patent with these other references ring particularly hollow for several reasons.

First, the new matter introduced by claims 8–9, 11–14 and 16–17 of the '800 patent is not present in any of the prior art references cited by defendant. For example, claim 8 teaches the method of claims 1–2 and 6–7 where, after the addition of the additional flocculating agent polymer, the flocculated metal compound is dewatered in a belt filter press. By comparison, Mace, which of the references cited by defendant most closely approximates this claim, teaches the addition of polymer to primary and secondary clarifiers and discusses the use of a belt filter, but does not mention the addition of additional flocculating agent polymer to the existing floccules prior to their passing through the belt filter. Similarly, unlike claim 11 of the patent, none of the prior art references describes the sequential treatment in clarifier and rotary drum thickener with additional polymers being added during this subprocess. Because critical elements are missing in all the prior art cited by defendant, no level of combination of those references can possibly yield the claims in question. Moreover, defendant has failed to provide any evidence, let alone clear and convincing evidence, that one skilled in the art would have extended the concepts in these references to provide the steps reflected in the subject claims of the patent which are missing in the prior art.

To be sure, the prior art does arguably reference the new matter introduced in claims 15 and 22. In particular, the EPA Manual teaches the use of anionic and cationic polymers for settling purposes in a settling pond. However, as is generally true of all defendant's arguments based upon the EPA Manual, no evidence has been provided that one skilled in the art would have combined the EPA Manual with the '497 patent or any of the other cited prior art references to derive claims 15 and 22. Indeed, the EPA Manual casts doubt on the use of hydroxides as neutralizers, one of the essential steps in claim 1 of the patent, noting that "sludges produced from highly acidic waters neutralized with caustic soda (NaOH) have very low densities and resist compaction despite long

storage detention times." Accordingly, it appears that one skilled in the art, upon reading the entire EPA Manual, would have been dissuaded, rather than encouraged, from combining the polymer and settling principles therein with a method for removing metal compounds similar to that described in claim 1. For these reasons and those discussed above, the court concludes that defendants assertions regarding claims 8–9, 11–17 and 22 are not well-taken.

A parting observation on this point is warranted. Although its brief professes otherwise, defendant seems to proceed on the notion that as long as it can identify in multiple sources all the elements of a claim, it matters not that there is nothing suggesting some linkage of these elements. But, the law is decidedly to the contrary.[37] To be sure, one skilled in the art, closeted in her office, with all the cited prior art conveniently selected and arrayed before her, might have compiled claims equivalent to those in the patent. But, if the case law stresses anything in regards to combination, it is that obviousness is not to be implied simply because all the pieces of a puzzle are present somewhere. Rather, like a real jigsaw puzzle, there must be some suggestion in the art of a complementing association, some teaching providing a guiding framework, or, at very least, some notching or padding of the puzzle pieces themselves, that would lead or incentivize one skilled in the art to derive the combination that is, in the end result, the claim. Here, as in so many of its other obviousness arguments, defendant has paid scant attention to this requirement, treating these all-important linkages almost as if they were self-evident. They are not. Indeed, if this court's jigsaw puzzle analogy goes astray at all, it is in assuming, *arguendo*, that all the pieces of the puzzle, *i.e.*, the elements of the claims, are even present—the foregoing discussion suggests that some pieces are missing and were actually supplied by the inventors here. Thus, contrary to defendant's importunings, its obviousness argument "is not a perfect puzzle into which all the pieces fit." *Louisiana Public Service Comm. v. F.C.C.*, 476 U.S. 355, 379, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).

Accordingly, for the reasons discussed above, the court concludes that defendant has demonstrated that claims 1–5, 18–21 and 23–25 of the '800 patent are obvious. However, defendant has not demonstrated that any of the other claims in the patent are invalid on this basis.[38]

## IV. CONCLUSION

In an oft-coined phrase, Chief Justice Arthur T. Vanderbilt of the New Jersey Supreme Court once stated that "judicial re-

---

37. It bears noting that because these assertions were not made at trial, plaintiffs were not alerted to the possibility that it might need to obtain testimony from Dr. Roth on these points. Indeed, while not determinative herein, there is arguably considerable variation between the issues identified by the parties and incorporated into the pretrial order in this case and some of the assertions made by defendant in its post-trial brief challenging the validity of the patent. In some cases, the additional theories of invalidation were raised for the first time at trial, without objection from plaintiffs; in other instances, this was not true.

38. On July 20, 2001, and July 24, 2001, plaintiffs submitted letters to the court regarding U.S. Application Serial No. 09/652,272, which was filed by Mr. Stevenson. The allowed claims of the Application are identical to the claims of the '800 patent, except that they are limited to the removal of copper, rather than the eight metals listed in the '800 patent. Plaintiffs claim that the significance of the granting of this application is the fact that the prior art raised by defendant in this litigation, including the EPA Manual, the '497 patent and Inglis, were expressly disclosed to the PTO. Plaintiffs assert that, despite these disclosures, the application was granted. They seek to have the court take judicial notice of these facts pursuant to Federal Rule of Evidence 201. Defendant, however, disputes plaintiffs' factual assertions, suggesting that it is unclear what was actually disclosed to the PTO and noting that at least some of the references were not disclosed until shortly before the application was granted. Defendant also observes that this court's constructions of the '497 and '800 patents were not disclosed to the examiner. The court also notes that while the Application was filed March 16, 1999, the court was not previously made aware of its pendency. Based on these circumstances, the court declines to take judicial notice of the circumstances that led up to the granting of the Application and does not rely upon these circumstances, or the granting of the Application itself, in rendering its ruling herein.

form is no sport for the short-winded." [39] The same apparently holds true of patent litigation. Reaching, at long last, the denouement of this lengthy tour *d'horizon*, the court rejects all but two prongs of defendant's Medusa-like challenge to the validity of the '497 and '800 patents. Those prongs, however, fatally strike at the heart of the '800 patent, leading this court to invalidate a number of claims therein.

Based upon the foregoing, this court, therefore, concludes:

1. Defendant's arguments regarding the validity of the '497 patent are not well-founded.

2. Claims 1–7, 10, 18–21, 23–25 of the '800 patent are invalid as in violation of the on-sale doctrine of 35 U.S.C. § 102(b).

3. Claims 1–5, 18–21 and 23–25 of the '800 patent are also invalid as obvious under 35 U.S.C. § 103(a).

4. Defendant's other arguments regarding the validity of the '800 patent are not well-founded.

By April 12, 2002, the parties shall file a joint status report indicating how this case should proceed, with a proposed schedule to the extent relevant.

**IT IS SO ORDERED.**

**39.** *Minimum Standards of Judicial Administration* at xix (Arthur T. Vanderbilt ed., The Law Center of New York University for the National Conference of Judicial Councils, 1949).